Yvette BROWN and Gerald Brown, Appellees,

v.

**PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE,** Appellant.

Superior Court of Pennsylvania.

Argued March 22, 2000.
Filed Aug. 30, 2000.
Reargument and Reconsideration Denied Nov. 2, 2000.

Audrey L. Jacobsen, Philadelphia, for appellant.

Neil E. Jokelson, Philadelphia, for appellees.

BEFORE: POPOVICH, TODD, and BROSKY, JJ.

TODD, J.:

¶ 1 In this negligence action, we are called upon to determine whether an erroneous syphilis diagnosis was the proximate cause of the breakdown of a marriage, physical violence and loss of employment. Appellant Philadelphia College of Osteopathic Medicine ("PCOM") sought a new trial following the entry of judgment against it upon a jury verdict totaling $510,000 plus delay damages in favor of Appellees Yvette and Gerald Brown.[1] On appeal PCOM argues, *inter alia*, that Appellees failed to prove a causal connection between its alleged negligence and the "remote and unforeseeable consequences and injuries" for which they claim damages. (Appellant's Brief at 13.) We agree. Accordingly, for the reasons set forth below, we reverse, vacate the judgment entered against PCOM, and remand this matter to the trial court with instructions to enter judgment notwithstanding the verdict in favor of PCOM.

¶ 2 The facts underlying this appeal may be gleaned from the complete trial record.[2] Yvette Brown delivered the couple's second child, a daughter, at PCOM on August 29, 1991. Soon after her delivery, the child was given a blood test to detect congenital syphilis.

¶ 3 Mrs. Brown testified that a PCOM physician told her the test results revealed that her daughter had been born with syphilis. The physician further told Mrs. Brown that the baby only could have contracted the disease from her. (N.T. Trial,

---

1. PCOM purported to appeal from the trial court's denial of its post-trial motions. Such an order is interlocutory and not appealable. *See Johnston the Florist v. TEDCO Const.*, 441 Pa.Super. 281, 288–87, 657 A.2d 511, 514 (1995). Instead, "an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." *Id.* In the present action, judgment was entered on the verdict on September 27, 1999.

2. The Honorable Paul Ribner, who presided over the trial of this matter, retired before Appellant's post-trial motions or Appellees' petition for delay damages could be decided. Although the Honorable Sandra Mazer Moss granted the petition for delay damages and denied Appellant's post-trial motions via a Memorandum Opinion dated August 3, 1999, Judge Moss did not file a formal opinion. Accordingly, we do not have the benefit of a comprehensive opinion of the trial court.

4/14/98, at 44.) Mrs. Brown testified that when her husband arrived at the hospital, she confronted him with the diagnosis and questioned whether he had been faithful to her. (*Id.* at 46.) Although Mr. Brown initially denied infidelity, he subsequently admitted to having begun an affair with a co-worker during the last trimester of his wife's pregnancy, an affair which did not terminate until after the birth of the child. (*Id.* at 49–50; N.T. Trial, 4/16/98, at 318–19, 338–39.) Mr. Brown testified that his wife became more upset after his confession of infidelity than she had been upon his arrival at the hospital after learning the results of the syphilis test. (N.T. Trial, 4/16/98, at 337.)

¶ 4 As a result of the diagnosis, the baby remained hospitalized for a few days after Mrs. Brown was released in order to start a series of injections to treat the congenital syphilis. (N.T. Trial, 4/14/98, at 51.) Mrs. Brown testified that the complete series of these injections, which continued after the baby was released from the hospital, lasted approximately five days. (*Id.*) In addition, Mrs. Brown received one injection to treat syphilis. (*Id.* at 55.)

¶ 5 Sometime after the baby was released from the hospital, the Browns requested that she be tested again for syphilis. They learned in October 1991 that the child, in fact, did not have syphilis. (*Id.* at 114.) In addition, results of a test performed on Mr. Brown, which were received by the Browns in December 1991,[3] revealed that Mr. Brown did not have syphilis.[4] (*Id.*)

¶ 6 Mrs. Brown testified that after the diagnosis the couple experienced "a lot of arguing, a lot of accusations, distrust" which they had not previously experienced in their marriage. (*Id.* at 55–57.) Eventu-

ally, Mr. Brown became physically abusive to his wife. (*Id.* at 60.)

¶ 7 Central to the Browns' damage claims in this litigation was an episode of abuse in November 1991. Mrs. Brown was, during the events that transpired which gave rise to this lawsuit, a police officer for the City of Philadelphia. She testified that this particular incident began when she received a telephone call at her home from her male partner on the police force. According to Mrs. Brown, upon hearing a man's voice on the line, Mr. Brown became suspicious and "snatched the phone out of the wall and hit me, and he hit me several times." (*Id.*) Mrs. Brown then retrieved her service revolver and pursued Mr. Brown out of the house. (*Id.*) As she described the incident that followed:

> I had a gun in my hand, in my underwear, was bleeding all over myself. I was enraged. I was in a blind rage, a maniac. And I went outside and I fired the gun outside after him. But the gun I fired at the car ... all the bullets hit the car. And Gerald was running down the street. But I was in such a rage, I didn't even know how many times I had fired the gun. I didn't even realize I was standing out there in my underwear bleeding until my neighbor called me.... And he and I were out there screaming at each other, "You gave me syphilis, you gave my baby syphilis, you are cheating on me and now you are going to beat me up," and I was calling all kinds of names and obscenities at him.

(*Id.* at 61–62.) During this altercation, Mrs. Brown suffered a concussion that required medical treatment. (*Id.* at 125.)

**3.** During his questioning of Mrs. Brown, her counsel referred to test results received in December 1992. *Id.* Mr. Brown testified that he received the test results in December 1991. (N.T. Trial, 4/16/98, at 324.) We assume, therefore, that Mrs. Brown's counsel misspoke.

**4.** Officials from the City of Philadelphia Department of Health visited the Brown's home, questioned the couple about their sexual relationships and tested Mr. Brown for syphilis. (*Id.* at 53.)

¶ 8 As a result of this incident, both of the Browns were arrested[5] and Mrs. Brown obtained a restraining order against her husband. (*Id.* at 132; N.T. Trial, 4/16/98, at 350–51.) Subsequently, Mrs. Brown was discharged from the Philadelphia police force for conduct unbecoming an officer. (N.T. Trial, 4/14/98, at 62–65, 69–72.) As a result of her dismissal for conduct unbecoming an officer, Mrs. Brown testified that it was her perception that she "could never be a police officer anywhere, not just in Philadelphia, but anywhere." (*Id.* at 73.) While Mrs. Brown testified that she had worked on both a full and a part-time basis at various jobs since leaving the Philadelphia Police Department, she also testified that, for at least a portion of that time, child care difficulties had prevented her from working full-time. (*Id.* at 138.)

¶ 9 The Browns separated after this incident and lived separately until February 1992 when Mr. Brown returned to the marital residence. (N.T. Trial, 4/16/98 at 347.) The parties subsequently separated again in approximately 1994 and have remained separated. (*Id.*) At the time of trial, the couple had not divorced. (*Id.* at 315.)

¶ 10 The Browns filed suit against PCOM in October 1993.[6] In their complaint, Appellees alleged that as a "direct and proximate result of the negligence of PCOM" Mrs. Brown suffered "severe physical and psychological damage" and "loss and/or impairment of her earnings and her earning capacity." (Complaint at ¶¶ 13–14.) Appellees further alleged that Mr. Brown was deprived of the "consortium, congical [sic] services, assistance, so-

ciety and companionship" of Mrs. Brown.[7] (*Id.* at ¶ 17.)

¶ 11 At the conclusion of the six-day trial in April 1998, the jury found in favor of the Browns and against PCOM on both negligence and negligent infliction of emotional distress. The jury awarded $500,000 in damages to Mrs. Brown and $10,000 to Mr. Brown. PCOM filed post-trial motions that were denied by the Honorable Sandra Mazer Moss on August 31, 1999. By the same order, Judge Mazer Moss granted the Browns' motion for the award of delay damages. After the addition of delay damages, the judgment totaled $666,983.90.

¶ 12 PCOM raises a plethora of issues on appeal.[8] These allegations of error fall into three general categories: (1) that the trial court erred in failing to grant judgment in favor of PCOM or a new trial for three reasons; (2) that the trial court erred in admitting the testimony of Appellees' expert witness as to Mrs. Brown's alleged loss of earning capacity; and (3) that the trial court erred in its charge to the jury.

¶ 13 We will begin with PCOM's argument that the trial court erred in refusing to grant judgment in its favor because Appellees "failed to prove causation between the alleged negligence of PCOM and the alleged remote and unforeseeable consequences and injuries." (Appellant's Brief at 13.) In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must "consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to ... the verdict winner." *Walker v. Grand Central Sani-*

5. Neither was prosecuted on any charges arising out of this incident. (*Id.* at 133.)

6. The Browns did not bring any claims for pain and suffering on behalf of the child.

7. The Complaint also averred that Mrs. Brown had "been forced to incure [sic] and will in the future continue to incure [sic] various expenses for her future medical care diagnosis and treatment" and that Mr. Brown

"has been and will be required to expend large sums of money for medical attention, hospitalization, medical supplies and medicines in an endeavor to cure his wife." (*Id.* at ¶¶ 15, 17.) The Browns provided no testimony at trial regarding any such expenses.

8. Indeed, PCOM raises eleven specific allegations of error regarding the jury charge alone.

*tation, Inc.*, 430 Pa.Super. 236, 239–42, 634 A.2d 237, 240 (1993). It is well-settled that "[w]e may reverse only if we find an abuse of discretion or an error of law which controlled the outcome of the case." *Id.* Moreover, "[o]ur standards of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical." *Id.*

¶ 14 In order to recover under either of the Browns' theories of liability as submitted to the jury—professional negligence and negligent infliction of emotional distress—they must prove the elements of a cause of action for negligence, i.e., "that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v. Evans*, 551 Pa. 496, 502, 711 A.2d 458, 461 (1998). *See also, Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 45, 2000 WL 778226, at *9 (Pa.Super.2000) ("absent a finding of negligence, the negligent infliction of emotional distress claim cannot survive").

¶ 15 The element of causation lies at the heart of this matter. For purposes of this appeal, we assume that PCOM owed a duty to the Browns and that in delivering the erroneous test results it breached that duty. In addition, we accept, as found by the jury, that PCOM's conduct was an actual cause of the eventual harm suffered by the Browns.

¶ 16 It is not sufficient, however, that a negligent act may be viewed, in retrospect, to have been one of the happenings in the series of events leading up to an injury. Even if the requirement of actual causation has been satisfied, there remains the issue of proximate or legal cause. See *Reilly v. Tiergarten Inc.*, 430 Pa.Super. 10, 14–16, 633 A.2d 208, 210 (1993) ("[t]o satisfy the requirement of causation, the complainant must demonstrate that the breach was both the proximate cause and the actual cause" of the injury) (citation omitted). While actual and proximate causation are "often hopelessly confused", a finding of proximate cause turns upon:

> whether the policy of the law will extend the responsibility for the [negligent] conduct to the consequences which have in fact occurred. . . . The term 'proximate cause' is applied by the courts to those more or less undefined considerations which limit liability even where the fact of causation is clearly established.

*Bell v. Irace*, 422 Pa.Super. 298, 301–03, 619 A.2d 365, 367 (1993) (quoting W.P. Keeton, *Prosser & Keeton, The Law of Torts* (5th ed.1984)).

¶ 17 Proximate cause "is primarily a problem of law" and "it is a Pennsylvania court's responsibility to evaluate the alleged facts and refuse to find an actor's conduct the legal cause of harm 'when it appears to the court *highly extraordinary* that [the actor's conduct] should have brought about the harm.' " *Id.* (emphasis original). Thus, proximate cause must "be determined by the judge and it must be established before the question of actual cause is put to the jury." *Reilly*, 633 A.2d at 210.

¶ 18 As a threshold issue, therefore, the trial judge must determine whether the alleged tortfeasor's conduct could have been the proximate, or legal, cause of the complainant's injury before sending the case to the jury. In the present case, the learned trial judge made no such threshold determination at any of the appropriate junctures for him to have done so. Instead, the trial court denied PCOM's motions for a nonsuit, a directed verdict and judgment notwithstanding the verdict. This was an error of law that controlled the outcome of the present case and on this basis we are constrained to reverse.

¶ 19 The law of this Commonwealth will not support a finding of proximate cause if, as in the present case, "the negligence, if any, was so remote that as a

matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently occurred." *Reilly*, 633 A.2d at 210. *Accord Bell*, 619 A.2d at 367 ("At the point in the causal chain when the consequence of the negligent act is no longer *reasonably* foreseeable, 'the passage of time and the span of distance mandate a cut-off point for liability.'") (emphasis original) (citation omitted).

¶ 20 To determine proximate cause, the Supreme Court of Pennsylvania has stated that "the question is whether the defendant's conduct was a 'substantial factor' in producing the injury." *Vattimo v. Lower Bucks Hosp., Inc.*, 502 Pa. 241, 246, 465 A.2d 1231, 1233 (1983) (plurality opinion). *Accord Novak v. Jeannette Dist. Mem. Hosp.*, 410 Pa.Super. 603, 605–07, 600 A.2d 616, 618 (1991) ("A determination of legal causation 'depends on whether the conduct has been so significant and important a cause that the defendants should be legally responsible.'") (quoting Prosser & Keeton, *The Law of Torts* (5th ed.1984)).

¶ 21 To determine whether an actor's conduct constitutes the proximate cause of an injury, the courts of the Commonwealth have adopted and relied upon the factors set forth in Section 433 of the Restatement (Second) of Torts. *See, e.g., Vattimo*, 502 Pa. at 246–47, 465 A.2d at 1233–34. This section provides:

> § 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm
>
> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts, § 433 (1965).

¶ 22 Applying these factors to the present case, it is abundantly clear that factors other than the negligence of PCOM had a far greater effect in producing the harm complained of by the Browns.[9] Mr. Brown conducted an extramarital affair and confessed this to his wife at a time when the affair was still ongoing. It is this affair and his confession to it, together with Mr. Brown's suspicions that his wife was having an affair herself, not the false diagnosis of syphilis, that had the greatest effect in bringing about the marital discord and eventual breakdown for which the couple seeks compensation. Under the first of the Restatement factors, therefore, the actions of PCOM are not a substantial factor in bringing about these alleged damages.

---

9. Even the allegations of the Browns' Complaint show that forces other than the negligence of PCOM were the proximate cause of their damages. The Complaint alleges that:

> As a direct and proximate result of the negligence of PCOM, wife Plaintiff suffered serious and severe physical and psychological damages as a consequence. Because of the nature of the disease and its communicability, wife Plaintiff accused husband Plaintiff of infecting her with a venereal *disease,* which husband Plaintiff denied. These accusations took place over several days in the course of which, husband Plaintiff *admitted to an extra-marital affair.* As a consequence of this admission, that marital relationship became extremely strained and at one point, resulted in physical violence. In self-defense, wife Plaintiff was caused to discharge a firearm in the direction of husband Plaintiff on the public streets of Philadelphia. As a consequence of this action, wife Plaintiff was terminated from her employment as a Philadelphia Police officer.

(Complaint, ¶ 13 (emphasis added).)

¶ 23 Under the second factor, it is clear that PCOM's conduct did not create "a force or series of forces which [were] in continuous and active operation up to the time of the harm." Instead, Mr. Brown confessed his adultery shortly after Mrs. Brown received the erroneous test results, before any retesting or verification of the results could be accomplished.

¶ 24 The third factor is lapse of time. In the present case, the child was born August 29, 1991 and was tested for syphilis shortly thereafter. The erroneous test results were delivered to the Browns, and Mr. Brown confessed his adultery while Mrs. Brown was still hospitalized recovering from the birth. By some time in October, they had learned that the diagnosis had been made in error. The primary physical altercation between the couple that resulted in Mrs. Brown's physical injury, the arrest of both parties, the filing of a protection from abuse order against Mr. Brown and the couples separation,[10] occurred more than two months after the receipt of the erroneous diagnosis and in the month after they learned that the diagnosis had been in error. Thus, the lapse of more than two months, between the erroneous diagnosis and the initial break up of their marriage, point to a finding that PCOM's negligence was not a substantial factor in bringing about this harm. Accordingly, under all three factors set forth in the Restatement analysis, PCOM's negligence was not a substantial factor in bringing about the breakdown of the Browns' marriage and, thus, was not a proximate cause of this harm.

▮ ¶ 25 Even more clearly, the erroneous test results were not the proximate cause of Mrs. Brown's alleged loss of income and earning capacity during the more than six years between the erroneous test and the trial. Instead, her independent act of discharging her service revolver in the direction of her husband on a public street (the month after she learned that the syphilis test results were erroneous) and the subsequent determination of the Philadelphia Police Department that such an action constituted conduct unbecoming an officer were the proximate causes of the termination of her employment as a police officer. This, combined with her difficulties in finding adequate child care that would permit her to pursue full-time employment, are the proximate causes of her alleged reduction in income and earning capacity.

¶ 26 Our decision that the damages alleged to have been suffered by the Browns are so remote from the actions of PCOM that PCOM cannot be held legally responsible for the harm is dictated by our prior jurisprudence on this issue wherein this Court has rejected similar attempts by plaintiffs to link damages to acts well beyond the point of reasonable foreseeability. *See, e.g., Matos v. Rivera,* 436 Pa.Super. 509, 515–16, 648 A.2d 337, 341 (1994) (holding that appellant who had been injured in an accident while riding in a stolen pizza delivery vehicle could not recover from the delivery driver from whom the car had been stolen or his employer because appellant could not meet proximate causation requirement); *Reilly,* 633 A.2d at 210 (intoxicated minor who was shot by police who were attempting to take him into custody could not recover from establishments where he had obtained alcohol; "appellant's assaults upon his father and the intervening police, as well as the police's subsequent wounding of appellant, were not the natural and probable results of appellees' failure to comply with the Dram Shop Act"); *Dudley v. USX Corp.,* 414 Pa.Super. 160, 174–75, 606 A.2d 916, 923 (1992) (death of appellant's decedent who fell from a tower while attempting to steal copper cable "too remote" to conclude that appellees' actions of purchasing copper cable constituted a substantial factor in

---

10. As discussed below, this incident also resulted in Mrs. Brown's termination from the Philadelphia police force.

bringing about decedent's death); *Novak*, 600 A.2d at 618 (appellees, who were involved in the closing of an allegedly safer means of access to a medical clinic, could not be held responsible for accident which later occurred at the remaining driveway; "[t]o believe that the accident in this case would have been avoided by a second driveway ... is to subsume probability in speculation"); *Van Mastrigt v. Delta Tau Delta*, 393 Pa.Super. 142, 150–51, 573 A.2d 1128, 1132 (1990) (appellant sued estate of woman he was convicted of murdering at fraternity party; "[e]ven if we were to believe that the decedent acted negligently in 'enticing' appellant to attend a party he did not wish to attend, this alleged misconduct would be too remote from the harm arising to the appellant to be considered a substantial factor in causing appellant's harm.").

¶ 27 The only physical harm suffered by Mrs. Brown in the present case that was the actual and proximate result of receiving the erroneous test result was her receipt of a single injection to treat a disease that she, in fact, did not have. (N.T. Trial, 4/14/98, at 108.) As she did not testify that this injection resulted in pain, suffering, discomfort, complications or any other difficulties, she cannot recover damages on this basis.

¶ 28 Unfortunately for Mrs. Brown, under the state of the law in this Commonwealth, she may not recover for any alleged emotional distress attendant to the erroneous diagnosis, because there is no evidence that her emotional distress was accompanied by the requisite physical impact. While we are sympathetic to Mrs. Brown's claims regarding the obvious and understandable emotional impact of this negligent diagnosis upon herself and her family, it is well-settled that such claims are not compensable under Pennsylvania law. Indeed, our Supreme Court has made clear that there can be no recovery for negligent infliction of emotional distress without a contemporaneous physical impact. *See Simmons v. Pacor, Inc.*, 543 Pa. 664, 676–77, 674 A.2d 232, 238 (1996) ("It is the general rule of this Commonwealth that there can be no recovery of damages for injuries resulting from fright or nervous shock or mental or emotional disturbances or distress unless they are accompanied by physical injury or physical impact."). If this basic tenet of Pennsylvania tort law is to change, it is not within this Court's province to do so.

¶ 29 Appellees argue in their brief that the physical impact requirement is met by their expert's testimony that Mrs. Brown suffered "prolonged and aggravated anger and rage" and "weight gain". (Appellee's Brief at 34.) Anger and rage are not physical impacts.[11] Similarly, weight gain occurring over a period of years, standing alone, is not the type of "immediate" physical impact required for recovery of damages for negligent infliction of emotional distress.[12] Finally, we

---

11. In support of their argument, Appellees rely upon *Armstrong v. Paoli Memorial Hospital*, 430 Pa.Super. 36, 633 A.2d 605 (1993) (holding that Plaintiff's immediate loss of bladder and bowel continence together with non-transitory depression, nightmares and insomnia constituted physical impact). This reliance is misplaced. This Court in *Armstrong* noted our prior holding in *Love v. Cramer*, 414 Pa.Super. 231, 606 A.2d 1175 (1992), that symptoms of severe, ongoing psychological distress "requiring psychological treatment" could constitute a sufficient physical manifestation to permit recovery for negligent infliction of emotional distress. In the present case, Mrs. Brown testified that in addition to her meeting with Appellees' expert, she had met with a police department counselor, apparently on only one occasion. (N.T. Trial, 4/14/98 at 136.) This is not the quantum of psychological distress requiring ongoing treatment envisioned by this Court in *Love* and *Armstrong*.

12. Appellees' expert did not testify that Mrs. Brown's weight gain was caused by the misdiagnosis or by her unnecessary injection to treat syphilis. Indeed, regarding her weight gain, he stated that she had admitted to "not working out, not taking proper care of herself." (Transcript of the videotaped testimony for trial of Robert Cancro, M.D. at 24.)

categorically reject Appellees' argument that the injuries inflicted upon Mrs. Brown by Mr. Brown during the physical altercation in November 1991 satisfy the requirement of a physical impact sufficient to permit Mrs. Brown to recover damages for negligent infliction of emotional distress by PCOM. (Appellees Brief at 34.) These injuries, which occurred more than two months after the misdiagnosis, were inflicted intentionally by Mr. Brown.

¶ 30 Moreover, *Doe v. Philadelphia Community Health Alternatives AIDS Task Force*, 745 A.2d 25, 28 (Pa.Super.2000), *appeal granted,* — Pa. —, 758 A.2d 166 (2000), a decision of this Court by which we are bound, makes clear that Pennsylvania law will not permit recovery for erroneous diagnosis of a disease alone without attendant physical impact, no matter how serious the erroneously-diagnosed disease may be nor how severe the emotional impact. *Id.*

¶ 31 In *Doe*, appellant was told, after two indeterminate tests, that his third test had revealed that he was HIV-positive. *Doe*, 745 A.2d at 26. On the basis of this test, the appellant in *Doe* embarked upon a treatment regime that included periodic blood tests, a prescription for the drug AZT and two influenza vaccinations administered during the course of seven appointments with his physician. *Id.* When appellant was screened to participate in a clinical trial, he discovered that, in fact, he was not HIV-positive. *Id.*

¶ 32 The appellant in *Doe* claimed that he had suffered "night sweats, nausea, loss of sleep, skin lesions, rashes, recurring headaches, hair loss, scalp irritation, recurring crying fits, loss of concentration, as well as extreme anxiety, depression, belief that he was going to die of AIDS ..., post traumatic stress disorder, permanent lack of trust in medical providers, despondency, humiliation and social isolation" as a result of the erroneous diagnosis. *Id.* A panel of this Court held that the physical injuries sustained by appellant, "such as sleeplessness and headaches, stem from [a]ppel-

lant's belief that he was HIV positive" and that such "'[f]ear of AIDS' claims are not cognizable" in Pennsylvania. *Id.* at 29. This Court further held that "we cannot conclude that two influenza vaccines, which were not the cause of any lasting physical or emotional effects, are sufficient to bootstrap [a]ppellant's claim that he suffered the 'physical impact' necessary to support a claim of negligent infliction of emotional distress." *Id.*

¶ 33 Accordingly, while we recognize that in this case the erroneous diagnosis alone certainly and foreseeably caused emotional upset, absent the legally requisite physical impact, Mrs. Brown cannot recover on this basis. As we noted in *Armstrong*, "[n]ot every wrong constitutes a legally cognizable cause of action.... Not every loss constitutes a legal injury for which compensation is available." *Armstrong*, 633 A.2d at 608 (citations omitted). As Mr. Brown's claims are derivative of his wife's, since she cannot recover, neither can he. *See Gregorio v. Zeluck*, 451 Pa.Super. 154, 163 n. 3, 678 A.2d 810, 815 n. 3 (1996).

¶ 34 The Browns did not prove that PCOM's conduct was the proximate cause of the harm that they alleged to have suffered. Further, the emotional harm suffered by Mrs. Brown, absent the requisite physical impact, does not constitute a legally cognizable claim under the law of this Commonwealth. Thus, the trial court erred in not granting judgment in favor of PCOM. Accordingly, we are constrained to reverse the judgment of the Court of Common Pleas of Philadelphia County and remand this matter for the entry of judgment in favor of Appellant Philadelphia College of Osteopathic Medicine notwithstanding the verdict. Because of our holding herein, we need not address the remaining issues raised in Appellant's Brief.

¶ 35 Reversed, judgment vacated, and remanded for entry of judgment notwith-

standing the verdict in favor of Appellant. Jurisdiction relinquished.