J-A15021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GORDON AND ROBIE HORNIG, H/W, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| LEHIGH VALLEY HOSPITAL AND VALLEY PHYSICIAN GROUP AND STEPHANIE L. GOREN-GARCIA, D.O. AND MATTHEW DYE, D.O., | |
| Appellees | No. 1780 EDA 2014 |

Appeal from the Judgment Entered August 12, 2014
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2012-C-2599

BEFORE:  BOWES, JENKINS AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                **FILED DECEMBER 07, 2015**

Gordon and Robie Hornig appeal from the judgment entered on a jury verdict in favor of Appellees, Lehigh Valley Hospital, Valley Physician Group, Dr. Stephanie L. Goren-Garcia, and Dr. Matthew Dye.  We affirm.

On June 15, 2012, the Hornigs instituted this medical malpractice action to recover damages allegedly caused by the failure of Dr. Goren-Garcia and Dr. Dye to discover that Mr. Hornig had sustained a ruptured tendon following an incident that occurred on Saturday, July 17, 2010.  That day, Mr. Hornig was mowing his lawn when a stone was violently expelled from the mower and struck him on the right ankle.  Mr. Hornig was unable

---

* Former Justice specially assigned to the Superior Court.

to walk and was heavily bleeding. He was transported by ambulance to the emergency room of Lehigh Valley Hospital.

At the emergency room, Mr. Hornig was first examined by Dr. Dye, who was then a fourth-year resident in the emergency department while Dr. Goren-Garcia was the attending emergency department physician. After conducting an examination, Dr. Dye determined that Mr. Hornig's tendon function was intact. Mr. Hornig sustained a laceration, and his ankle was x-rayed to determine if there was any debris in the wound. After the wound was cleansed, the ankle was x-rayed again to ensure that all foreign matter was removed. The laceration was sutured, and Mr. Hornig was discharged with pain medication and instructions that he follow up with his primary care physician within three days.

On Monday, July 19, 2010, Mr. Hornig saw his primary care physician, Dr. Kevin Rodowicz, who was not a named defendant in this action. Mr. Hornig was experiencing pain and, if he did not keep the ankle raised, swelling. After Dr. Rodowicz examined Mr. Hornig on July 19, 2010, Dr. Rodowicz told him to visit again in one week to have the stitches removed. On July 26, 2010, Mr. Hornig returned to Dr. Rodowicz, complaining of limited range of motion in the ankle and of continued pain. Dr. Rodowicz removed the stitches. Mr. Hornig saw Dr. Rodowicz a third time on August 9, 2010, because he "was still unable to properly move the foot or dorsiflex [, which means to move the toes back towards the body,] the foot." N.T.

Trial, 1/8/14, at 15. Dr. Rodowicz then recommended that Mr. Hornig consult with an orthopedic specialist.

On August 9, 2010, Mr. Hornig spoke to Dr. Christopher Hawkins, an orthopedist. Dr. Hawkins ordered an MRI, which revealed that Mr. Hornig had a "full thickness tear of the tibialis anterior tendon of the leg," also known as a ruptured tendon. *Id*. at 16. On August 17, 2010, Mr. Hornig was seen by Dr. Jason Rudolph, an ankle specialist, and underwent surgery three days later to repair and lengthen the tendon. Dr. Rudolph also freed the tendon from scar tissue.

Over the ensuing months, Mr. Hornig underwent physical therapy and treated with Dr. Rudolph. After Mr. Hornig continued to have pain and remained unable to properly use his right foot and ankle, a second surgery was performed on December 12, 2010. Due to unabated pain and diminished function in his right foot, Mr. Hornig was seen by a different orthopedic surgeon, Dr. Alan Tuckman, who performed two additional surgeries. Thereafter, the pain resolved, and Mr. Hornig was able to resume his two jobs as well as perform all of his household chores and activities of daily living. Mr. Hornig continued to have a limp, used a boot for certain functions, and was unable to run.

The Hornigs' position at trial was that Doctors Goren-Garcia and Dye were negligent when they failed to diagnose Mr. Hornig's ruptured tendon while Mr. Hornig was in the emergency room and failed to recommend that

he immediately consult with an orthopedist. Their expert witness opined that the delay in diagnosis of the ruptured tendon was malpractice and caused Mr. Hornig's existing disabilities. Appellees countered with an expert witness whose conclusion was that the doctors were not negligent in that they conducted the medically appropriate examination of the ankle to eliminate the possible existence of a ruptured tendon. Appellees' expert also reported that the rock, which severed the tendon, rather than any delay in diagnosis, was responsible for the continued injuries suffered by Mr. Hornig. The jury determined that Appellees were not negligent and returned a verdict in their favor. The Hornigs filed a post-trial motion, which was denied. This appeal followed.

The Hornigs issues on appeal are as follows:

A. Should this Court Order a New Trial on the Issues of Causation and Damages as Against Matthew Dye, D.O., Stephanie L. Goren-Garcia, D.O., Lehigh Valley Hospital, and Lehigh Valley Physician Group Due to the Trial Court's Failure to Direct a Verdict in Plaintiffs Favor on the Issue of Negligence After Matthew Dye, D.O. Admitted that He Negligently Failed to Obtain a Consultation with an Orthopaedist Once He Suspected that Gordon Hornig Suffered a Ruptured Anterior Tibialis Tendon?

B. Should this Court Order a New Trial When the Trial Court Abused its Discretion in Precluding Plaintiffs from Challenging Stephanie L. Goren-Garcia, D.O.'s Credibility on Cross-Examination with Rosen's Emergency Medicine after the Trial Court Permitted Dr. Goren-Garcia to Testify as to the Contents of that Text on Direct Examination over Plaintiffs' Objection Despite that Dr. Goren-Garcia "Opened the Door" as to the Contents of the Text?

C. Should this Court Order a New Trial When the Trial Court Abused its Discretion in Permitting Defendants' Orthopaedic Expert, Samir Mehta, M.D., to Testify as to the New Theory of Causation He Asserted in an Untimely Prepared and Produced Report but Effectively Precluding Gordon Hornig's Treating Physician from Testifying as to the Untimely New Theory and Purposely Precluding Plaintiffs' Orthopaedic Expert, Stuart D. Miller, M.D., from Addressing or Evaluating the Untimely New Theory During His Live Testimony?

Appellant's brief at 3.

The Hornigs first maintain that Dr. Dye admitted that he was negligent and that they were thus entitled to a directed verdict[1] as to liability against Dr. Dye and a directed verdict against the remaining defendants since they were vicariously liable for Dr. Dye's misfeasance.[2] Thus, the Hornigs contend that they are entitled to judgment in their favor as to liability despite the jury's contrary finding. In other words, they seek judgment notwithstanding the verdict. "Our standards of review when considering

_____

[1] The Hornigs moved for a directed verdict following the close of the defense evidence. N.T. Jury Trial, 1/10/14, at 141. They stated, "It is for Dr. Dye as to negligence. It is for Dr. Goren-Garcia as to vicarious liability for Dr. Dye. And it is as to Lehigh Valley Hospital for vicarious liability to Dr. Dye." *Id*.

[2] The Hornigs' argument is presented in a confusing manner. In their statement of issues, they seek a new trial as to damages and liability based upon the purported admission by Dr. Dye that he was negligent. The Hornigs maintain that this admission entitled them to a directed verdict as to liability. However, if the Hornigs were entitled to a directed verdict as to liability, as they suggest, then there would be no need for a new trial on liability. Instead, the matter of liability would be settled by the directed verdict. The Hornigs' request for a new trial as to liability is thus inconsistent with their position that they are entitled to a directed verdict on liability. We address the position appropriately.

motions for a directed verdict and judgment notwithstanding the verdict are identical." **Brown v. Philadelphia Coll. of Osteopathic Med.**, 760 A.2d 863, 868 (Pa.Super. 2000) (citation omitted). When we examine the trial court's refusal to grant judgment in favor of a party, we are required to "consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner." *Id*. at 867 (citation omitted). We reverse "only if we find an abuse of discretion or an error of law which controlled the outcome of the case." *Id*. at 868 (citation omitted).

In the present case, the Hornigs posit, "Dr. Dye admitted at trial that he did not comply with the standard of care in treating Mr. Hornig in the emergency department of Lehigh Valley Hospital." Appellants' brief at 29. They reference pages 289 and 290 of the reproduced record. After review, we disagree with the Hornigs' characterization of Dr. Dye's statements therein.

Dr. Dye never admitted that he violated the applicable standard of care or that he was negligent. Rather, Dr. Dye admitted that **if** he had suspected that there was a ruptured tendon, the applicable standard of care mandated that he immediately call an orthopedic surgeon. Specifically, Dr. Dye testified that he would have called orthopedist, "**If** my exam had exhibited some finding that made me suspect" the existence of a ruptured tendon. N.T. Jury Trial, 1/9/14, at 221 (emphasis added). Dr. Dye repeated,

- 6 -

"This -- again, I was saying that **if** I had expected [a ruptured tendon] or **if** I had suspected it after my exam or based on my exam, I would have called an orthopedist." **Id**. (emphases added). Dr. Dye acknowledged that medical standards dictate that an orthopedist be summoned immediately if a ruptured tendon has been diagnosed.

Nevertheless, the record, viewed in the light most favorable to Appellees, as verdict winners, established that Dr. Dye conducted the medically appropriate examination of Mr. Hornig's ankle and concluded that Mr. Hornig had not sustained a ruptured tendon. Specifically, the notes of Dr. Dye's examination revealed that the tendon was examined and that, in Dr. Dye's view, the tendon was intact. Dr. Dye testified that those notations established that "tendon function was examined" on Mr. Hornig and that Dr. Dye "did an exam that made me comfortable that the tendons were functioning the way we want." **Id** at 190.

Dr. Dye explained that he conducted two functions to rule out the possibility of a ruptured tendon. First, he moved aside skin and muscle and viewed the tendon. Then, Dr. Dye conducted a range of motion test on the ankle that satisfied him that the tendon was intact. **Id** at 194. Dr. Dye delineated that an examination to establish that a tendon was intact would mean he would check "every motion of the ankle. So I would ask him to

dorsiflex the foot, to plantar flex the foot, move it side to side, invert, evert, rotate. All the motions of that joint that I would expect[.]" *Id*. at 179.[3] Dr. Dye reported that Mr. Hornig performed all those motions normally. *Id*. Dr. Dye continued:

> We test tendons in the emergency room. We test strength against resistance, and range of motion is typically a part of that. But the strength -- the money is in strength against resistance. If you can move your -- especially in this case where there's redundancy. There's multiple muscles and tendons that do the same thing. If you can move that extremity, but then, with resistance, you might have a noticeable weakness or deficit. So that exam is with resistance, are you able to move to -- are you as strong as you should be? . . . . In Mr. Hornig's case, I remember thinking that despite his pain, I felt like he was very strong. I could pull pretty hard.
>
> I remember testing -- and I do remember testing against resistance with dorsiflexion. I remember testing his great toe separately. And I remember thinking that [the tendon] was intact and I didn't question that. I was comfortable with that.

*Id*. at 180-81.

To summarize, Dr. Dye reported that he did want to rule out the possibility of a tendon tear and performed the appropriate tests by moving aside skin and muscle and looking at the tendon and by manipulating his patient's foot. Thereafter, Dr. Dye concluded that Mr. Hornig did not have a ruptured tendon. Dr. Dye did not admit that he violated the standard of care or was negligent.

---

[3] Evert means to turn an object outward.

On cross-examination, Dr. Dye specifically was asked, "Now, you indicated that you suspected a tendon injury. Can we agree that if you suspect a tendon injury, the standard of care requires you to refer the patient to an orthopedist?" *Id*. at 220. Dr. Dye responded, "I think the standard of care requires me to attempt to rule it out." *Id*. Dr. Dye was adamant that, after his tests, he no longer thought that Mr. Hornig had sustained a ruptured tendon. *Id*. at 227. Dr. Dye acknowledged that he missed the ruptured tendon.

We observe that the mere fact that a physician commits a medical error does not render him negligent as a matter of law. *See Passarello v. Grumbine,* 87 A.3d 285, 297 (Pa. 2014). Rather, to establish malpractice, the plaintiff must show that the physician owed him a duty, there was a breach of that duty, the breach was a substantial factor in causing the harm suffered by the plaintiff, and damage resulted from the harm. *Thierfelder v. Wolfert*, 617 295, 316-17, 52 A.3d 1251, 1264 (Pa. 2012). Breach of duty is not present unless the physician deviated from the applicable standard of care. *See K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080 (Pa.Super. 2015). In this case, Dr. Dye never admitted that he deviated from the applicable standard of care; thus, we reject the Hornigs' first position.

The Hornigs' next allegation is that they are entitled to a new trial because they were improperly restricted in their cross-examination of Dr.

Goren-Garcia. Our standard of review as to a trial court's evidentiary ruling well settled. "A trial judge has considerable latitude in determining the scope of cross-examination and his determination will not be reversed in the absence of an abuse of discretion unless a party suffers an obvious disadvantage." *Majczyk v. Oesch*, 789 A.2d 717, 726 (Pa.Super. 2001) (*en banc*). Additionally, our consideration of any allegation that a party is entitled to a new trial "is grounded firmly in the harmless error doctrine which underlies every decision to grant or deny a new trial." *Knowles v. Levan*, 15 A.3d 504, 507 (Pa.Super. 2011) (citation omitted). We do not award a new trial "merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id*. Harmless error does not warrant a new trial, and error is harmless if it did not affect the verdict. *Id*. at 508 n. 4.

The Hornigs' second issue is premised upon the following restriction in questioning. Dr. Goren-Garcia first admitted that "the time frame that you would send the patient [with a ruptured tendon] for an orthopedic consult would be as soon as possible[.]" N.T. Jury Trial, 1/10/14, at 126. After obtaining this acknowledgement, the Hornigs asked the question "that's what Rosen's says, isn't it?" *Id*. At that point, the Hornigs sought to question Dr. Goren-Garcia with the contents of "Rosen's," which is a treatise entitled *Rosen's Emergency Medicine, Concepts, and Clinical Practice* and

- 10 -

was written by Marx, Hockberger, and Walls. The trial court refused to allow the inquiry.

Meanwhile, Dr. Goren-Garcia already had been fully examined on the contents of that treatise. She was asked "Do you know what Rosen's textbook on emergency medicine says about concerns about tendon ruptures -- anterior tibial tendon ruptures -- and referral to an orthopedic surgeon?" *Id*. at 95. Dr. Goren-Garcia responded, "Yes, I do." *Id*. The record continues as follows:

> Q  Can you tell the jury what Rosen's textbook on emergency medicine says?
>
> A  Sure. There are two very small . . . . paragraphs on injuries to the anterior tibial tendon. In fact, sentences within paragraphs. What the book actually says is most of the discussion is related to spontaneous ruptures, not traumatic ruptures. And the rupture is, at some point, refer to a orthopedic surgery for a decision about whether repair is indicated. And that implies that most of those spontaneous ruptures were in older patients, most likely less active than someone like Mr. Hornig. The sentence that Rosen's includes about traumatic implies that -- well, **it says that if they are transected during trauma, they should be referred to orthopedic for further evaluation for consideration of surgical intervention**.

*Id*. at 95-96 (emphasis added). Thus, the jury already had been apprised precisely what Rosen's said.

Additionally, Dr. Dye was specifically questioned about Rosen's, as follows:

> Q  And we can agree that Rosen's Emergency Medicine is standard text in the area of emergency medicine?

A  Yes.

Q  It's something that's used in medical schools?

A  Yes.

Q It's something that you continue to use today?

A  Correct.

Q  **And we can agree that pursuant to Rosen's Emergency Medicine, the standard of care is just what you testified to at your deposition. That if you suspect a tendon injury, you make a referral to an orthopedist right then, correct**?

A  **Correct**.
. . . .

Q  **We can agree that standard of care would apply to both you and Dr. Garen-Garcia**?

A. Yes.

N.T. Jury Trial, 1/9/14, at 223 (emphasis added).

Thus, the jury was well aware of what Rosen's recommended when a ruptured tendon is diagnosed.  It mandates that an orthopedist be consulted.  Indeed, both doctors admitted that the applicable standard of care required them to obtain an orthopedist immediately after a ruptured tendon is diagnosed.  Rosen's was consistent with this standard. Additionally, Dr. Dye was fully cross-examined on the contents of Rosen's and stated that it applied to Dr. Goren-Garcia.  At trial, no one disputed that Rosen's and the standard of care were consistent and required an orthopedic consult upon diagnosis of a ruptured tendon.  Any error in the restriction of

Dr. Gosen-Garcia's questioning about the contents of Rosen's was harmless. It could not have affected the verdict because the jury was told about Rosen's recommendations twice.

The Hornigs' final complaint has two aspects. First, they argue that the trial court erred in permitting Appellees' orthopedic expert witness, Dr. Samir Mehta, to testify that scarring from the tendon rupture was the cause of Mr. Hornig's continuing disabilities in that this opinion was beyond the fair scope of Dr. Mehta's timely expert report. Secondarily, they maintain that their expert Dr. Stuart D. Miller was improperly restricted during his direct examination.

The following facts are pertinent to the fair-scope averment. On October 20, 2013, Dr. Mehta issued a report indicating that Mr. Hornig's limp and inability to run would have occurred even if the tendon rupture had been diagnosed on the day of the incident. He reported that projectiles striking the tendon and tearing it was the cause of Mr. Hornig's harm and that the delayed discovery of the ruptured tendon had no effect on the fact that the tendon did not fully repair.

After that report was issued, Mr. Hornig agreed to undergo a defense medical examination by Dr. Mehta on December 18, 2013. After that appointment, Dr. Mehta issued a supplemental report on December 24, 2013, indicating that scarring was present in the ankle and was the cause of Mr. Hornig's restricted use of his tendon.

- 13 -

The Hornigs complain that the December 24, 2013 opinion about the scarring went beyond the fair scope of the original report from Dr. Mehta, catching them off-guard and unable to defend against this new theory at trial. Appellees and the trial court both suggest that this fair-scope argument was waived as it was not preserved in the Hornigs' post-trial motion. We concur. Our review of that document reveals a single mention of Dr. Mehta. Specifically, the Hornigs maintained, "The trial court erred in precluding Plaintiff expert Stuart D. Miller from opining as to the testimony of Samir Mehta M.D." Motion of Plaintiffs for Post-Trial Relief, 1/17/14, at ¶ 11.

We have noted, "If an issue has not been raised in a post-trial motion, it is waived for appeal purposes." **Siculietano v. K & B Amusements Corp.**, 915 A.2d 130, 132 (Pa.Super. 2006). In that case, this Court further observed:

> Pennsylvania Rule of Civil Procedure 227.1(b)(2) indicates that the grounds for post-trial relief must be specified in the motion, and "grounds not specified are deemed waived." In addition, the Comment to Pa.R.Civ.P. 227.1 states, "In requiring the motion to state the specific grounds therefore, motions which set forth mere 'boilerplate' language are specifically disapproved. A post-trial motion must set forth the theories in support thereof 'so that the lower court will know what it is being asked to decide.'" **See Treasure Lake Property Owners Association, Inc. v. Meyer**, 832 A.2d 477 (Pa.Super. 2003) (holding that issues must be raised specifically in post-trial motion).

**Id**. at 133.

Nothing in the Hornigs' post-trial motion alerted the trial court to their present complaint, which is that Dr. Mehta was allowed to testify beyond the fair scope of his initial report and that the Hornigs were unfairly surprised by his supplemental opinion. Hence, the trial court did not address that position, and this aspect of the Hornigs' third issue on appeal is waived.

As noted, the third allegation raised on appeal also involves a complaint that the Hornigs' expert Dr. Miller was improperly restricted from testifying about the scarring issue. However, the Hornigs' appellate brief contains a single paragraph of argumentation as to this complaint. Appellants' brief at 43. Therein, the Hornigs fail to point to the place in the record where their direct examination of Dr. Miller was curtailed, and they neither set forth the basis for the trial court's evidentiary ruling nor develop reasoned argument as to why it was incorrect. Similarly, in this paragraph, the Hornigs fail to reference any legal authority. Hence, we conclude that, for a different reason, this position is also waived.

As our Supreme Court observed in **Commonwealth v. Perez**, 93 A.3d 829, 837 (Pa. 2014), the rules of appellate procedure "set forth the fundamental requirements every appellate brief must meet." The Court admonished litigants:

> The briefing requirements scrupulously delineated in our
> appellate rules are not mere trifling matters of stylistic
> preference; rather, they represent a studied determination by
> our Court and its rules committee of the most efficacious manner
> by which appellate review may be conducted so that a litigant's

right to judicial review may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates is mandatory.

*Id*. at 837-38 (citation omitted). Therein, the Court ruled that "to the extent [an] appellant's claims fail to contain developed argument or citation to supporting authorities and the record, they are waived[.]" *Id*. at 838; *see also Lackner v. Glosser*, 892 A.2d 21 (Pa.Super. 2006) (undeveloped arguments, which include those where no legal authority is cited, are considered waived); Pa.R.A.P. 2119 (a) (providing that argument portion of a brief must be divided into as many parts as there are issues raised and the particular question raised shall be followed by "citation of authorities as are deemed pertinent").

Herein, the Hornigs' allegation that their direct examination of Dr. Miller was improperly restricted is undeveloped and unsupported by citation to authorities and the record. Hence, it is waived.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/7/2015

- 16 -