J-A10017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TINA LOCKE, INDIVIDUALLY AND AS ADMINISTRATIX OF THE ESTATE OF REGINA LOCKE, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 237 EDA 2019 |
| FOX CHASE CANCER CENTER, JEFFREY THORLEY, M.D., MALA KAILASAM, M.D., WILLOWCREST REHAB, ALBERT EINSTEIN MEDICAL CENTER, MANMEET SINGH, M.D., JEANES HOSPITAL | : : : : : : | |

Appeal from the Order Entered January 2, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  December Term, 2014 No. 03551

BEFORE:  BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:            **FILED AUGUST 19, 2020**

Tina Locke (Locke), Individually and Administratrix of the Estate of

Regina Locke, Deceased, appeals from the judgment entered against her and

---

[*] Retired Senior Judge assigned to the Superior Court.

in favor of the Fox Chase Defendants[1] in this medical malpractice action.[2]  As succinctly summarized by the trial court:

> Tina Locke[] sued the medical providers involved in the care of her mother, Regina Locke.  Regina Locke was a bladder cancer patient who died in 2013 of complications from a fungal and urinary tract infection that spread to her kidneys.  [Tina Locke] alleged at trial that [the Fox Chase] Defendants were negligent in failing to timely and accurately diagnose and treat [Regina Locke's] infections, in failing to order additional tests, and in failing to promptly follow up on a notable test result.

On appeal, Locke challenges the court's denial of her motion for a new trial on the bases of an allegedly erroneous jury instruction and the court's preclusion of the autopsy report.  We affirm.

## I.

We provide the following more detailed statement of facts and procedural history based on our independent review of the record and the trial court's June 11, 2019 opinion.

After Regina Locke was diagnosed with bladder cancer in October 2012, she immediately began aggressive treatment.  In October and December 2012, she underwent two surgical procedures on her bladder and had a stent

---

[1] The Fox Chase Defendants included Fox Chase Cancer Medical Group, Inc.; American Oncological Hospital, A/K/A Fox Chase Cancer Center; Jeffrey Thorley, M.D.; and Mala T. Kailasam, M.D.

[2] On August 29, 2018, the court entered a non-suit against, *inter alia*, Albert Einstein Medical Center; Willowcrest Rehab; Manmeet Singh, M.D. and Jeanes Hospital.

placed in her uterer. After those procedures, she had the following interactions with medical providers.

**A.**

*Fox Chase January 3-9, 2013*

On January 3, 2013, Ms. Locke met with her surgeon at Fox Chase to discuss removal of her bladder. The surgeon observed concerning symptoms, including an elevated heart rate and general weakness. He referred her for immediate inpatient admission due to his suspicion that she had an infection, for which she was at an especially high risk because of her cancer, recent surgeries, ureter stent and status as a diabetic. She was sent to the Direct Response Unit (DRU) at Fox Chase for examination. Dr. Jeffrey Thorley was her attending physician between January 3-6, 2013, while Dr. Mala Kailasam was her attending physician between January 6-9, 2013. The DRU staff agreed with the surgeon's findings, and they noted a high white blood cell count (another infection indicator), plus a history of altered mental status over the previous few days. After giving Ms. Locke a Foley catheter, the drainage bag began to show blood and pus. Additionally, a mysterious five-centimeter "worm-like" object was discovered in the bag. (N.T. Trial, 8/28/18, at 71). Dr. Thorley ordered that the contents of her catheter bag be sent to the pathology lab for analysis.

In the resulting pathology report, Ms. Locke was diagnosed with a "complicated" urinary tract infection (UTI) due to her being a recent surgical

patient with cancer and locally impaired immune function causing her to be admitted.[3] The complicated UTI had a greater chance of higher severity, of spreading to nearby organs like the kidneys, and a larger pool of potential infecting pathogens. Although this pathology lab was completed on January 3, 2013, it was not reported until six days later, on January 9, 2013, and Dr. Thorley did not attempt to follow up about it before that date.

A urine culture also was performed on Ms. Locke, which identified a bacterial pathogen. She was treated for this bacterial infection[4] with antibiotics and appeared to improve after six days. On the sixth day, January 9, 2013, Dr. Kailasam discharged Ms. Locke at 3:00 P.M. after reviewing all then-available labs. At 3:42 P.M., after Ms. Locke had been discharged, the pathology report was sent up and it identified the "worm" as an "inflammatory clot with fungi and bacteria." (N.T. Trial, 8/28/18, at 95). Dr. Kailasam's discharge note was entered at 5:42 P.M., but she testified that she did not remember if she saw this pathology report between the time she discharged Ms. Locke at 3:00 P.M. and writing her note at 5:42 P.M.

---

[3] UTIs are designated as "complicated" or "uncomplicated" based on the relative health of the patient.

[4] Infections may be either bacterial, fungal or polymicrobial (both). Bacterial and fungal infections respond to different treatments and, therefore, must be treated with antibiotic and antifungal medications.

**B.**

*Willowcrest Rehab and Einstein Medical Hospital*
*January 10-14, 2013*

After being discharged from Fox Chase, Ms. Locke had intervening encounters with Willowcrest Rehab and Einstein Medical Center from January 10-14, 2013. On January 10, 2013, Ms. Locke's daughters brought her to Willowcrest Rehab at Einstein Medical Center where she was admitted for skilled nursing care. At first, Ms. Locke remained stable, but by January 13, 2013, her condition had worsened and she had a fever of 103.1 degrees. A new urine culture revealed a significant positive result for fungus (greater than 100,000 colonies of yeast),[5] an elevated white blood cell count and decreased kidney function.

Although Ms. Locke was transferred to the emergency room at Albert Einstein Medical Center at that time, her labs were not forwarded, and the only mention of the urine culture in the notes was that there had been a positive finding of yeast, but that the Willowcrest doctor thought that the test was likely contaminated and unreliable. The notes did not mention the 100,000 colonies of yeast. The ER staff treated Ms. Locke with an antibiotic only. Although an infectious disease consult was ordered, it had not been

---

[5] Locke's experts opined that this result confirmed that Ms. Locke had a yeast infection of the urinary tract.

conducted by the time Ms. Locke's daughters arranged for a transfer back to Fox Chase on January 14, 2013.

## C.

*Fox Chase January 14-19, 2013*

Ms. Locke was readmitted to Fox Chase on January 14, 2013, and remained there until January 19, 2013. During this time, Dr. Thorley was again her attending physician. Nurses attempted to take a urine culture upon Ms. Locke's readmission but were unable to do so due to her urinary incontinence. No further attempts at a culture were attempted and the nurses did not inform the doctors that one had not been taken. There was no new infectious disease consult ordered, although the transfer notes reflected that one had not taken place. Additionally, no one at Fox Chase spoke with Willowcrest staff about the details of the positive yeast culture. Ms. Locke was given one last dose of the antibiotics she had started at Willowcrest, but they were discontinued on January 15, 2013, with no replacement therapies.

On January 16, 2013, Ms. Locke experienced a fever of 102 degrees, tachycardia, increased creatine and other symptoms evidencing a UTI. No infectious disease consult was ordered, and on January 18, 2013, she experienced a myocardial infarction and went into cardiogenic and septic shock. She was transferred to Jeanes Hospital for emergency cardiovascular surgery.

**D.**

*Jeanes Hospital and Fox Chase January 19-29, 2013*

Ms. Locke began her treatment at Jeanes Hospital on January 19, 2013. On January 20, 2013, Ms. Locke had an infectious disease consult. After another culture was positive for yeast, Ms. Locke was started on antifungals. When her condition stabilized, she was transferred back to Fox Chase, where she remained from January 24-29, 2013. Dr. Thorley testified that her condition had greatly improved after returning from Jeanes Hospital. His team placed an aortic balloon to help regulate her blood pressure and antifungal treatment continued. However, Ms. Locke's sacral decubitus ulcers (bedsores) significantly worsened during her stay at Fox Chase, and on January 29, 2013, she was discharged back to Willowcrest Rehab to continue antifungal and sacral wound treatments.

**E.**

*Willowcrest Rehab and Einstein Medical Center
January 29-February 11, 2013*

Between January 29, 2013, until her death on February 11, 2013, Ms. Locke was treated at Willowcrest Rehab and Einstein Medical Center. At Willowcrest, Ms. Locke battled complications from the fungal infection, her sacral wounds, new bacterial infections and cardiovascular issues. On February 9, 2013, she was transferred to Einstein Medical Center, where she was found to have contracted gas gangrene and necrotizing fasciitis in her left leg, but she was a poor candidate for its amputation due to her fragile state.

Ms. Locke continued to decline and her daughters elected hospice care. She died at Einstein Medical Center on February 11, 2013.

On February 12, 2013, Vivian Arguello-Guerra, M.D., a pathologist employed by Albert Einstein Medical Center, performed an autopsy on Ms. Locke. In her report, she identified the provisional cause of death as "urinary tract infection with septic shock." The final anatomical diagnosis after microscopic examination identified the number one cause of death as "URINARY TRACT INFECTION WITH ASCENDING ACUTE PYELONEPHRITIS, BILATERAL, SEVERE: POSITIVE CULTURES FOR YEAST AND NON-HEMOLYTIC STREPTOCOCCUS." (Fox Chase Defendants' Motion *in Limine*, 8/09/18, at 4; Expert Report of Mark C. Paznansky, M.D., Ph.D., 9/12/16, at 7).[6] "According to the autopsy report, the cause of death was 'most likely multiorgan failure due to sepsis arising from acute pyelonephritis[7] in a setting of high grade urothelial carcinoma.'" (Expert Report of Philip M. Arlen, M.D., 9/16/16, at 2) (quoting Paznansky Expert Report, at 7).

---

[6] Although the autopsy report is quoted in the Fox Chase Defendant's Motion *in Limine* to preclude its admission and was argued extensively by the parties, the actual report is not part of the record. Locke agrees that the Fox Chase motion correctly quotes the relevant portion of the report. (**See** Locke's Brief, at 18 n.4).

[7] Kidney infection.

**II.**

In December 2014, Locke initiated this medical negligence-wrongful death and survival action. Trial commenced on August 24, 2018. On August 27, 2018, the trial court heard argument on, *inter alia*, the Fox Chase Defendants' Motion *in Limine* to preclude the admission and publication of the autopsy report. (**See** N.T. Trial, 8/27/18, at 26-27). After argument, the trial court found that the experts could testify that they relied on the autopsy report in forming their opinions, but that the report itself could not be admitted or published to the jury because it was hearsay, and Dr. Arguello-Guerra would not be testifying and subject to cross-examination. (**See id.** at 69).

At trial, Locke's theory was that over the course of Regina Locke's admissions, Fox Chase and its employees, Drs. Thorley and Kailasam, "repeatedly failed to properly diagnose and timely treat [her] urosepsis, a sepsis infection of the urinary tract." (Locke's Brief, at 19) (citing N.T. Trial, 8/28/18, at 62, 83). More specifically, she alleged that the Fox Chase Defendants negligently caused Regina Locke's death by their collective failure to administer anti-fungal medication, which "allowed the urosepsis to fester, worsen and eventually infect her kidneys, a condition known as acute bilateral pyelonephritis." (Locke's Brief, at 20; **see id.** at 19) (citing N.T. 8/28/18, at 121). She argued that "[t]he sepsis spread throughout [Regina Locke's] body, causing her to experience cardiogenic and septic shock, *i.e.*, sepsis-induced

heart failure, and ultimately to die." (***Id.*** at 20) (citing N.T. Trial, 8/31/18, at 128).

Conversely, the Fox Chase Defendants denied that they were negligent and maintained that because Regina Locke "had a highly complex medical history, with cancer superimposed upon other chronic illnesses, the outcome was 'not unexpected.'" (***Id.***) (citing N.T. Trial, 8/31/18, at 108).

On September 4, 2018, the trial court held a charging conference with the parties' counsel at which it agreed that Standard Civil Jury Instruction 6.50, Vicarious Liability—Employer and Employee Sued—Relationship and Authority Not in Dispute[8] was appropriate because Fox Chase had stipulated

---

[8] Pennsylvania Suggested Standard Jury Instruction 6.50 has undergone many adaptations. (***See*** Locke's Brief, at 25 n.6). The version that the parties submitted in their proposed points for charge and on which the trial court relied in its jury instructions reads as follows:

> In this case it is admitted that the defendant [*name of employee*] was at the time of the occurrence acting as the [employee] [servant] of the other defendant, known as the [employer] [master], and was engaged in furthering the interests, activities, affairs, or business of [his] [her] [employer] [master]. A[n] [employer] [master] is liable for the negligence of his or her [employee] [servant] occurring while the latter was acting in the course and within the scope of his or her employment.

> Therefore, if you find the defendant [*name of employee*] to be liable, then you must find the defendant [*name of employer*] also liable. If, however, you find the defendant [*name of employee*] not liable, then you must find the other defendant not liable also.

Pa. SSJI (Civ.) 6.50 (Fourth Edition, 2017 Supplement).

that Drs. Thorley and Kailasam were its agents or employees. (**See** N.T. Trial, 9/04/18, at 192). The trial court reserved its ruling as to whether to charge the jury on the corporate liability of Fox Chase pursuant to Pennsylvania Suggested Standard Civil Jury Instruction 14.70, Corporate Liability of a Health Care Provider. (**See id.** at 208). The next day, the court announced its ruling that it would charge the jury on corporate liability pursuant to 14.70(c).[9]

During the court's charge to the jury, it instructed, in relevant part:

_____

[9] Pennsylvania Suggested Standard Jury Instruction 14.70(c) provides:

> A [*health care institution*] is directly liable to the patient if it violates a duty that it owes to the patient to ensure the patient's safety and well-being while under the care of [*the health care institution*]. The following are the duties that a [*health care institution*] must fulfill and that it cannot pass on to anyone else.
>
> *    *    *
>
> c. a duty to oversee all persons who practice [*nursing/other relevant person's health care*] within its walls as to patient care[.]
>
> If you decide that the defendant[s] violated any one of those duties [specify which duty or duties are applicable], you must then decide
>
> a. Whether the [health-care institution] knew or should have known of the breach of that duty, and
>
> b. That the conduct was a factual cause in bringing about the harm or injury.

Pa. SSJI (Civ.) 14.70(c).

An employer is liable for the negligence of its employees occurring while the latter were acting in the course and scope of his or her employment. Therefore, if you find a defendant, Dr. Thorley and/or Dr. Kailasam, to be liable, then you must find the defendant, Fox Chase, also liable. If, however, you find the defendant, Dr. Thorley and/or Dr. Kailasam, not liable, then you must find the other defendant not liable also.

\* \* \*

The Fox Chase Cancer Center is directly liable to the patient if it violates a duty that it owes to the patient to ensure the patient's safety and well being while under the care of the Fox Chase Cancer Center. This is one of the duties that the institution must fulfill and that it cannot pass on to anyone else, the duty to oversee all persons who practice within its walls as to patient care.

If you decide that this defendant violated any of that duty, you must decide whether this institution knew or should have known of the breach of that duty and that the conduct was a factual cause in bringing about the harm or injury.

(N.T. Trial, 9/05/18, at 80-81, 85-86).

Thereafter, the following exchange occurred:

[**Locke's Counsel**]: Okay, Your Honor, I only had one request for clarification, and it was with regard to the jury instruction under 6.50, which was the . . . employer vicarious liability charge. . . . [I]t's inconsistent to say that . . . Fox Chase can only be found liable if [Dr.] Thorley is found negligent or Dr. Kailasam, because we also did have the corporate one in there. So, the way it reads or the way it read, 6.50 says the following at the end, it says . . . Therefore, if you find the Defendant Thorley to be liable then you must find the Defendant Fox Chase also liable. If, however, you find the Defendant Thorley not liable then must find the other defendant not liable also.

So that's inconsistent with the corporate one, that's Fox Chase—they could have like a verdict if Thorley is not liable, Kailasam is not liable, but the breach—but independent breaches of Fox Chase would also show—can be sufficient. . . .

**THE COURT**: [Defense counsel].

- 12 -

[**Defense Counsel**]: I disagree. I think that the jury heard both charges. . . . And I think it is clear, based on the corporate negligence charge, that Fox Chase could be found negligent if they find that they didn't meet the standard of care on what was charged to the jury.

**THE COURT**: I will not give them any more instruction on that. I think Fox Chase can be found negligent even if they don't find them negligent under 6.50.

[**Locke's Counsel**]: Right. But under the first charge, as you read it, which would have been the first one they heard, look, if Thorley and Kailasam are not negligent you cannot find Fox Chase negligent. That's directly contradictory, though, to the corporate one which says that, yes, Fox Chase can be independently. So if we can just have that clarified that, yes, that Fox Chase can alone be held responsible, that would correct any of that.

**THE COURT**: Your exception is noted.

[**Locke's Counsel**]: Thank you, Your Honor.

(*Id.* at 97-99).

In its verdict, the jury found that although Dr. Thorley and Fox Chase were negligent, this negligence was not the factual cause of Regina Locke's harm and, therefore, they were not liable. The jury found that Dr. Kailasam was not negligent.[10]

---

[10] Specifically, the verdict sheet read as follows:

### VERDICT SHEET

**Question 1:** Do you find that any of the Defendants were negligent?

| | |
|---|---|
| Defendant Fox Chase Cancer Center | Yes X  No ___ |
| Defendant Jeffrey D. Thorley, M.D. | Yes X  No ___ |

- 13 -

Locke timely filed a motion for post-trial relief seeking a new trial,[11] maintaining that the trial court improperly precluded the autopsy report and that it erred by including the language, "If . . . you find the defendant [name of employee] not liable, then you must find the other defendants not liable also[,]" in its vicarious liability charge, because this precluded a finding of liability against Fox Chase under the corporate liability theory. (**See** Post-Trial Motion, 9/16/18, at 2-13, 24-27). The court denied the motion on January 2, 2019. Judgment was entered on March 8, 2019, and Locke timely appealed.[12]

---

Defendant Mala T. Kailasam, M.D.    Yes ___ No X

**(If you answer Question 1 "No" as to all Defendants, the Plaintiff cannot recover and you should not answer any further questions and should return to the Courtroom.)**

**Question 2:** Was the negligence of those Defendants you have found to be negligent a factual cause of any harm to the Plaintiff?

Defendant Fox Chase Cancer Center    Yes ___ No X
Defendant Jeffrey D. Thorley, M.D.    Yes ___ No X
Defendant Mala T. Kailasam, M.D.    Yes ___ No X

**(If you answer Question 2 "No" as to all Defendants you have found to be negligent, the Plaintiff cannot recover and you should not answer any further questions and should return to the Courtroom).**

[11] Although not relevant to this appeal, the motion also sought a Judgment Not Withstanding the Verdict (JNOV) on bases abandoned here.

[12] Locke improperly appealed from the denial of the post-trial motions. **See Brown v. Philadelphia College of Osteopathic Medicine**, 760 A.2d 863 (Pa. Super. 2000) (appeal does not properly lie from order denying post-trial motions, but rather upon judgment entered following disposition of post-trial

- 14 -

Both she and the trial court have complied with Rule 1925. *See* Pa.R.A.P. 1925.

## III.

Locke argues that the trial court erred in denying her motion for a new trial[13] because it improperly: (1) charged the jury by "incorrectly adapting the second half of Pa.SSJI (Civ.) 6.50 to this case so as to instruct [them] that if either Dr. Thorley or Dr. Kailasam were not liable, then Fox Chase would also be not liable[;]" and (2) "preclude[ed] [her] from publishing to the jury, in whole or in part, the autopsy report, which contained medical facts essential

---

motions). On February 8, 2019, we directed her to file a *praecipe* to enter judgment with the trial court prothonotary and provide this Court with proof of same. Locke did so and we treat her appeal as timely filed. *See* Pa.R.A.P. 905(a)(5).

[13] We review the trial court's denial of a new trial for an abuse of discretion because "absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Czimmer v. Jansenn Pharm., Inc.*, 122 A.3d 1043, 1051 (Pa. Super. 2015) (citation omitted). We undertake a two-part analysis.

> We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

*Id.* (citation omitted).

to rebut the defense theory that the patient's death was not unexpected[.]" (Locke's Brief, at 7).

**A.**

We first turn to Locke's challenge to the trial court's jury instruction as misleading. "Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. *James v. Albert Einstein Medical Center*, 170 A.3d 1156, 1163-64 (Pa. Super. 2017) (citation omitted). Our Supreme Court has held that a jury needs adequate instructions, not the best or clearest ones. Indeed, it has stated

> A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

*Commonwealth v. Baker*, 963 A.2d 495, 507 (Pa. Super. 2008) (citation omitted).

Even though the trial court read the jury instructions requested, Locke maintains that defense counsel believed that due to their inconsistency, the trial court would omit the last sentence of the suggested vicarious liability instruction (6.50) when it ruled that it would provide the corporate liability charge (14.70(c)). (*See* Locke's Brief, at 28). She notes that the second sentence of 6.50, which provides that an employer cannot be vicariously liable

- 16 -

if an employee is not liable, purportedly is in conflict with 14.70(c) that allows a finding that an employer is directly liable for failing to oversee any staff within its walls, even if a named employee is not liable.[14], [15]  (**See id.** at 29).

The Fox Chase Defendants reply that not only did the trial court accurately state the law in the jury charge, it expressly instructed that the jury could find Fox Chase vicariously liable for any negligent actions of Drs. Thorley and/or Kailasam.

A review of the record confirms that the trial court accurately read the Pennsylvania Suggested Standard Jury Instructions for vicarious liability and corporate negligence.  (**See** N.T. Trial, 9/05/18, at 80-81, 85-86).

---

[14] Locke also argues by instructing that, if either **Dr. Thorley** and/or **Dr. Kailasam** is not liable, then Fox Chase cannot be liable, the trial court improperly precluded a finding that Fox Chase was vicariously liable for the negligence of its **unnamed** employees. (**See** Locke's Brief, at 30).  In support of this argument, she relies on **Estate of Denmark v. Williams**, 117 A.3d 300, 306 (Pa. Super. 2015), for the proposition that an employer can be held vicariously liable for employees who are unnamed in a complaint, but identified as a unit, *e.g.*, as "staff," if they acted negligently during the course and scope of their employment.  (**See id.**).  However, this argument is irrelevant here where Locke did not include unnamed employees or staff in the complaint, but only sought to hold Fox Chase vicariously liable for the actions of named doctors, Drs. Thorley and/or Kailasam.

[15] As noted by the Fox Chase Defendants, Locke also argues for the first time that the trial court compounded its error by using the phrase "and/or" in charging the jury on vicarious liability (6.50).  (**See** Fox Chase Defendants' Brief, at 4 n.1; Locke's Brief, at 33-34).  They maintain that the argument is waived for Locke's failure to raise it in the trial court.  However, our substantive review confirms that it also lacks merit where she has failed to prove that this language constituted fundamental error that palpably misled the jury.  **See Stewart**, **supra** at 540.

In pertinent part, it charged the jury regarding vicarious liability as follows:

> Regarding agency, counsel for the plaintiff and counsel for the defendant agree that Dr. Thorley and Dr. Kailasam were, during the time in question, acting as agents for the Fox Chase Cancer Center. In this case, it is admitted that the defendants, Dr. Thorley and Dr. Kailasam, were at the time of the occurrence acting as employees of the other defendant known as the employer and were engaged in furthering the interests, activities, affairs or business of their employer. An employer is liable for the negligence of its employees occurring while the latter were acting in the course and within the scope of his or her employment. **Therefore, if you find a defendant, Dr. Thorley and/or Dr. Kailasam, to be liable, then you must find the defendant, Fox Chase, also liable. If, however, you find the defendant, Dr. Thorley and/or Dr. Kailasam, not liable, then you must find the other defendant not liable also.**

(***Id.*** at 80-81) (emphasis added).

> Regarding the corporate liability of Fox Chase, it instructed the jury that:

> **The Fox Chase Cancer Center is directly liable to a patient if it violates a duty that it owes to the patient to ensure the patient's safety and well-being while under the care of the Fox Chase Cancer Center**. This is one of the duties that the institution must fulfill and that it cannot pass on to anyone else, the duty to oversee all persons who practice within its walls as to patient care. If you decide that this defendant violated any of that duty, you must decide whether this institution knew or should have known of the breach of that duty and that the conduct was a factual cause in bringing about harm or injury.

(***Id.*** at 85-86) (emphasis added).

There is no evidence that the jury was palpably misled by the two charges that resulted in prejudice to Locke. The charges clearly stated the law and there was no prejudicial omission of something basic or fundamental. In its vicarious liability instruction (6.50), the trial court accurately set forth

- 18 -

the general principle that an employer is liable for the negligence of its employees occurring while the latter were acting in the course and within the scope of his or her employment. The last sentence of the charge applies that general principle of agency law to the facts of this case in that Fox Chase would only be liable under that theory if Dr. Thorley and/or Dr. Kailasam were liable.

It then gave a separate corporate liability charge (14.70(c)) that Fox Chase is directly liable if it violates a duty to the patient to ensure the patient's safety and well-being while under its care. The trial court then went on to instruct that it is a duty that the institution must itself fulfill and that it cannot pass on to anyone else, and if it found that Fox Chase violated that duty to oversee all persons who practice within its walls as to patient care and it was a factual cause of a plaintiff's harm, it could find Fox Chase independently negligent.

As can be seen, each instruction on vicarious liability and corporate liability stated the law with respect to each and they were sufficiently clear as to what was involved for the jury to find Fox Chase liable under either theory.[16]

---

[16] The record reflects that the jury submitted questions to the court about other, unrelated issues and, therefore, if it was confused about any perceived conflict, it was aware that it could seek clarification. (*See* N.T. 9/06/18, at 3-5).

- 19 -

In fact, the jury on the verdict sheet expressly found Fox Chase itself negligent.

What the jury was also clear about is that even though Fox Chase and Dr. Thorley were negligent, they accepted Fox Chase Defendant's defense that they were not the cause of Regina Locke's death. Accordingly, we conclude that the jury instructions, when read as a whole, sufficiently advised the jury of the applicable law.

**B.**

Next, we review Locke's argument that the trial court erred in denying her motion for a new trial because it improperly granted the Fox Chase Defendants' Motion *in Limine* to preclude the admission and publication of the autopsy report. Locke argues that she was "irreparably prejudiced" because the report contained medical facts that were essential to rebut the defense theory that Regina Locke's death was not unexpected due to her bladder cancer and history of chronic disease. (Locke's Brief, at 40). She maintains that the report was admissible under three different theories: (1) as an exception to the hearsay rule[17] because it is a statement authored by an agent of opposing party Albert Einstein Medical Center, (2) the business records

---

[17] Hearsay, an out of court statement made by a declarant who is not testifying, admitted for the truth of the matter asserted, is precluded unless subject to an exception. *See* Pa.R.E. 801, 802. Here, it is uncontested that the autopsy report is hearsay.

exception to the hearsay rule, and (3) because autopsy reports are the type of data reasonably relied on by experts in forming their opinions pursuant to Pennsylvania Rule of Evidence 703.

The Fox Chase Defendants respond that Locke's argument "is substantively meritless" because the report's findings constituted hearsay statements and she has failed to establish an exception.[18] (The Fox Chase Defendants' Brief, at 14). They maintain that: (2) the report was not an admission by a party-opponent because neither the Fox Chase Defendants nor their agents authored the report, (2) that it was a medical opinion and thus not admissible under Rule 803(6) as a business record, and (3) Rule 703 explains the bases on which an expert can form an opinion, but does not permit the admission of hearsay statements in evidence. (*See id.* at 19-24).

**1.**

Locke contends that the trial court erred in precluding the autopsy report because the opposing party's statement exception to the hearsay rule applies. She maintains that because the author of the autopsy report, Dr. Arguello-

_____

[18] The Fox Chase Defendants also maintain that this issue is waived because Locke's counsel expressly conceded that, although the experts would rely on the autopsy report in forming their own opinions and testify to that fact, the report itself could not be published to the jury. (*See* Fox Chase Defendants' Brief, at 12-13) (citing N.T. Trial, 8/27/18, at 27-28). However, in reviewing Locke's response and after our independent review of the record, we conclude that her counsel also later argued for the autopsy report's publication because "[i]t's no different than when we put up a medical record." (N.T. Trial, 8/27/18, at [6]8-[6]9); *see also* Locke's Brief, at 44-45). Therefore, we decline to find waiver.

- 21 -

Guerra, is a pathologist employed by Albert Einstein Medical Center, the trial court erred in precluding the report's admission. (**See** Locke's Brief, at 42).

Pennsylvania Rule of Evidence 803(25) provides an exception to the hearsay rule where "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity[.]" Pa.R.E. 803(25). Here, while the statement was made by an agent of opposing party Albert Einstein Medical Center, Locke intended to offer it as substantive evidence to be used against the Fox Chase Defendants' defense that Ms. Locke's death was not unexpected, not against Albert Einstein Medical Center. Therefore, the autopsy report does not fall under the exception found at Rule 803(25).

**2.**

Locke next argues that the autopsy report falls under the business record exception to the hearsay rule because it was kept in the regular course and scope of Albert Einstein Medical Center's business. (**See** Locke's Brief, at 42).

It is well-settled that the business record exception "applies to records of an act, event or condition, but does not include opinions and diagnoses." Pa.R.E. 803(6), *Comment*. This clear language has been interpreted to mean that records containing either opinion evidence or diagnoses are not admissible under the business records exception. **See In re A.J.R.-H.**, 188 A.3d 1157, 1169 (Pa. 2018). We have held that pursuant to the business

records exception, hospital records are admissible to show facts, including symptoms found, but that any medical opinions contained therein are not admissible where the doctor who offered the opinion is not available for cross-examination. **See Walsh v. Kubiak**, 661 A.2d 416, 421 (Pa. Super. 1995), *appeal denied*, 672 A.2d 309 (Pa. 1996).

In this case, the autopsy report listed Dr. Arguello-Guerra's diagnoses of the provisional and final causes of death based on her examination and opined about the "most likely" source of sepsis and "most likely" cause of death. (Paznansky Expert Report, at 7). These are not facts, but diagnoses, and, as such, were inadmissible where Dr. Arguello-Guerra was not available to testify. **See In re A.J.R.-H.**, **supra** at 1169; **Kubiak**, **supra** at 421. Hence, the trial court properly precluded their admission and publication to the jury.

Moreover, even if the report could have been severely redacted to allow for the admission of facts such as that Regina Locke suffered urinary tract and fungal infections and carcinoma of the bladder, any failure to preclude this data was not reversible error where this was merely cumulative of what experts already had testified. **See Kubiak**, **supra** at 422 (error in admitting evidence does not constitute reversible error where it is merely cumulative and buttresses properly admitted testimony). Accordingly, the admission of this limited information would not have changed the outcome of the trial and does not support the granting of a new trial.

**3.**

Finally, Locke maintains that because the autopsy report is the type of record on which an expert witness would reasonably rely, it was admissible pursuant to Pennsylvania Rule of Evidence 703. (**See** Locke's Brief, at 42-43).

Rule 703, Bases of an Expert's Opinion Testimony, provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Based on this clear language, Rule 703 provides that an expert witness can rely on a record if it is of the type on which experts in his or her field reasonably rely, even if the record itself is not admissible. It does not provide an exception that allows for the admission of the otherwise inadmissible evidence. Here, it is undisputed that the autopsy report is hearsay.

At trial, the trial court expressly ruled that the experts could testify that they relied on the autopsy report in forming their opinions, but that no portion of the report could be published to the jurors. (**See** N.T. Trial, 8/27/18, at 69; **see also id.** at 28 (Locke's counsel agreeing that the experts could rely on the report but that it could not be published to the jury)). This ruling was entirely consistent with Pennsylvania Rule of Evidence 703 where the report is inadmissible hearsay.

Accordingly, for all of the above reasons, we conclude that the trial court properly denied Locke's motion for a new trial.

Judgment affirmed.

Judges Bowes joins the memorandum.

Judge Shogan concurs in the result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 8/19/2020*