J-A24007-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| ROBERT SHERRY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHEETZ, INC. | : | No. 528 WDA 2020 |

Appeal from the Order Entered April 2, 2020
In the Court of Common Pleas of Blair County Civil Division at No(s):
2016 GN 2647

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    FILED NOVEMBER 18, 2020

Appellant, Robert Sherry, appeals from the trial court's April 2, 2020 order granting summary judgment in favor of Appellee, Sheetz, Inc.  We affirm.

The trial court summarized the factual and procedural history of this case as follows:

> This civil action arises out of a physical assault that took place on March 2, 2016[,] in the parking lot of the Sheetz Store located at the intersection of 6th Avenue and 58th Street within Altoona, Blair County, PA.  This location is known as Sheetz "Store No. 7[."] [Appellant] was assaulted by Eric Hageder, who was involved in extensive criminal activity [on] that date which began in Robinson, PA[,] and ended after a 40[-]mile police chase in Huntingdon, PA. Earlier on the date in question, Hageder had physically assaulted his girlfriend at his girlfriend's grandmother's house.  He then went to a friend's house and stole a car.  He later robbed a man at a convenience store in Indiana, PA[,] by beating him with a tire iron and stealing his wallet and cigarettes.  Hageder then drove until he arrived at the Sheetz Store No. 7, whereupon he assaulted [Appellant] in the parking lot and stole his truck.  The subject incident started at approximately 3:14 a.m.

[On February 15, 2018, Appellant filed an amended complaint against Sheetz, alleging that Sheetz was negligent, inter alia, "[i]n failing to provide adequate security when there was a history of violent crimes in the parking lot of the subject store," and "[i]n failing to provide adequate security given the subject store's location and the nature of the store's business which included money handling, an on-site ATM and public restrooms[.]" See Amended Complaint, 2/15/18, at ¶¶ 24(s), (u).] On December 6, 2019, [Sheetz] filed a Motion for Summary Judgment and Brief in Support. After being granted an extension of time, [Appellant] filed a Response to [Sheetz's] Motion for Summary Judgment and Brief in Opposition to [Sheetz's] Motion for Summary Judgment on January 15, 2020. In his response, [Appellant] included an expert report and curriculum vitae from Jack F. Dowling, attached as Exhibit D to [Appellant's] Brief. [Sheetz] filed a Motion to Strike Expert Report of Jack Dowling, CPP[,] on January 22, 2020. On or about January 29, 2020, [Appellant] filed a Response to [Sheetz's] Motion to Strike Expert Report. [This court] entered an Opinion and Order[,] dated February 14, 2020[,] denying [Sheetz's] Motion to Strike Expert Report.

With leave of court, [Sheetz] filed a Reply Brief in Support of its Motion for Summary Judgment on March 11, 2020. [Appellant] filed a Sur-Reply Brief in Opposition to [Sheetz's] Motion for Summary Judgment on March 27, 2020.

On April 2, 2020, [this court] entered an Opinion and Order granting [Sheetz's] Motion for Summary Judgment.

On April 27, 2020, [Appellant's] timely Notice of Appeal was docketed.[1] On April 24, 2020, [this court] issued a [Pa.R.A.P.] 1925(b) Order directing … Appellant to file a concise statement of … errors complained of on appeal no later than twenty-one (21) days after filing and service of the Rule 1925(b) Order.[2] [] Appellant timely complied with such order, filing his Statement of Errors Complained of on Appeal on May 15, 2020.

Pa.R.A.P. 1925(a) Opinion, 5/26/20, at 1-3 (internal citations omitted).

_____

[1] Appellant's notice of appeal was dated April 21, 2020.

[2] The trial court's Rule 1925(b) order was docketed on April 27, 2020, the same day that Appellant's notice of appeal was entered on the docket.

Further, the trial court provided the following synopsis of Sheetz's motion for summary judgment and Appellant's response thereto:

> In its motion, [Sheetz] sets forth as "Undisputed Material Facts" the averments contained within paragraphs 1 through 10. In [Appellant's] Response to [Sheetz's] Motion for Summary Judgment, [Appellant] "admits that [Sheetz] has accurately recited certain of Eric Hageder's pre–assault activities, as transcribed and testified to by Officer [Christine] Heck." These admissions apply for paragraphs 1 through 8, inclusive, and paragraph 10. Therefore, as a result, the following facts have been admitted for purposes of our decision hereunder:
>
> > 1. This case arises out [of] an assault that took place on [Appellant] by Eric Hageder in the parking lot owned by Sheetz, Inc.[,] being operated as a convenience store at the intersection of Sixth Avenue and 58th Street in Altoona (hereinafter "Sheetz store" or "Store No. 7") on March 2, 2016.
> >
> > 2. Prior to arriving at Store No. 7, Hageder assaulted his companion, Margaret Lynn Polhamus, at Polhamus'[s] grandmother's house in Robinson, PA[,] by punching her in the face, kicking her in the stomach[,] and shooting her up with heroin.
> >
> > 3. After beating up Ms. Polhamus, Hageder went to a friend's house and stole his friend's car.
> >
> > 4. After stealing his friend's car, Hageder robbed a man at a convenience store in Indiana, PA, by beating the man with a tire iron and stealing his wallet and cigarettes.
> >
> > 5. Hageder then drove for a while until he arrived at the Sheetz Store in Altoona, where he assaulted [Appellant] and stole [Appellant's] truck.
> >
> > 6. The surveillance video of the assault at the Sheetz store depicts Hageder arriving in the Sheetz parking lot at 3:14:18 a.m.[,] and Hageder opening the hood of the first stolen vehicle as if there were mechanical problems.
> >
> > 7. Less than five minutes later, at 3:19:07 [a.m.], the assault of [Appellant] began.

8. The assault lasted approximately 33 seconds, ending at 3:19:40 [a.m].

9. Hageder was on the Sheetz premises for just over 5 minutes.[3]

10. Based upon statements transcribed by the Altoona Police Department, as set forth in the police interview of Hageder by then[-]Sergeant Ben Jones..., Hageder stated the following:

> a. When asked why he came to Altoona, Hageder said "Nothing, really[."]
>
> b. Hageder was told that he'd had 15 to 20 cop cars chasing him after the assault at Sheetz and he replied, "I was hoping for more[."]
>
> c. Hageder was told he was chased by cops for 40 miles, to which he responded, "I thought that was pretty damn good[."]
>
> d. Hageder wanted to be on the news broadcast.
>
> e. Hageder was already on parole for aggravated assault and stated that his being arrested was "[n]ot my first rodeo[."]
>
> f. Hageder wanted to "go out suicide by fucking cop[."]
>
> g. When asked why Hageder committed these crimes, Hageder stated[,] "I went fucking nuts.  That's my side of the story.  I went fucking nuts[."]

The Sheetz surveillance videos further confirm that neither Mr. Hageder nor the passenger in his vehicle, Ms. Polhamus, ever entered the store, remaining inside and around their vehicle from 3:14:18 [a.m.,] until the assault commenced at 3:19:07 [a.m.], a time period just short of five minutes.  The actual assault by Mr. Hageder upon [Appellant] began at approximately 3:19:07 [a.m.,] and ended at 3:19:40 [a.m.], covering a time span of

_____

[3] Appellant believes that Hageder was on Sheetz's premises for approximately six minutes.  See Appellant's Response to Sheetz's Motion for Summary Judgment, 1/15/20, at 3 (unnumbered pages).

approximately 33 seconds. After the assault, Mr. Hageder obtained the keys and stole [Appellant's] truck. He and Ms. Polhamus left the area, resulting in an eventual high[-]speed pursuit by the Pennsylvania State Police before he was apprehended and arrested.

* * *

Summary of [Appellant's] Arguments and [Sheetz's] Reponses:

[Appellant] filed a detailed 57-page Brief in Opposition to [Sheetz's] Motion for Summary Judgment and a 10-page Sur-Reply Brief. [Appellant's] arguments in defense of the summary judgment motion are summarized as follows:

1. Inadequate Staffing at Store No. 7. It is undisputed that on the date in question, there were three (3) employees working at Store No. 7 — Samantha Woomer, Melissa Snyder and Amy Stiffler. During her deposition, Ms. Snyder, a Salesperson, testified that she did not think that staffing at Store No. 7 was adequate, particularly due to the fact that an adjacent business (Blair Sign Company) let out at 3:00 a.m.[,] and the influx of customers made it difficult for three employees to cover their duties. Ms. Snyder opined that this raised concern[s] from her perspective as to safety and security, and she claimed she raised these concerns with management.

In his Brief, [Appellant] sets forth a detailed timeline as to what each employee was doing during the relevant time frame on the date in question. In summary, [Appellant] argues that despite the fact that Mr. Hageder and Ms. Polhamus were loitering outside for a few minutes prior to the assault and only a few feet outside the 58th Street entrance to Store No. 7, that no store employee observed them park in a handicapped spot; no one noticed suspicious loitering activities; no one observed the physical assault of Mr. Hageder upon [Appellant]; nor did any employee observe Mr. Hageder's and Ms. Polhamus'[s] theft of [Appellant's] truck and their getaway.

In response, [Sheetz] asserts that the record does not establish negligence on its part relative to staffing. Karen Rhoades, who has served as the Manager of Store No. 7 for eighteen (18) years, testified that although employees may grumble at times as to the work to be done, the store has always been staffed properly. She explained that staffing is determined by customer flow tracked by

a system called Kronos. Sam Janisko, Sheetz Production and Facilities Manager, explained that Sheetz['s] staffing is not governed solely by Kronos, but that the Operations Department ultimately controls staffing[,] and that as to security issues, that "…it[ is] inherently a part of it based on our history."

Thus, [Sheetz] argues that the record evidence does not support [Appellant's] allegation that Store No. 7 was understaffed, and further, there is no record evidence that additional staffing would have prevented the criminal assault by Hageder upon [Appellant.]

2. Inadequate Lighting at Store No. 7. [Appellant] also alleges that there was inadequate lighting at Store No. 7. [Appellant] cites deposition testimony of Sheetz employees (or former employees) as follows:

> "If we would have been able to see outside the windows, I could have at least of hollered out through the door, 'hey[,]' you know — at least try to get them deterred[."]

> "…it[ i]s something that shouldn't have happened…[.] We should have been able to see somebody … right outside our windows from the registers, of what was happening to somebody. And we didn't see that…[.] We should have been able to see outside those windows…[.] It's [j]ust we didn't see what was going on right in front of us." -Amy Stiffler, deposition of February 18, 2019.

> []Question – ["]Do you recall, as part of your training, there being any distinction made between watching out for suspicious behavior in the middle of the day versus the middle of the night?["]

> Answer – ["]I don't recall if it was in the training or not, or if it was just within me. I know at night time I was definitely more aware.["]

> Question – ["]And why is that?["]

> Answer – ["]Because it's Altoona and it[ is] dark. More crimes happen at night th[a]n during the day." -Samantha Woomer, deposition of February 18, 2019.

> ["]We always told them that it was hard to see out unless someone's headlights were on, shining in. Then we could see that. But we did complain to them that we could not

see out those windows at night[."]   -Melissa Snyder, deposition of February 18, 2019.

In support of this theory of liability, [Appellant] is also relying upon [his] expert witness, Jack Dowling, who is President/Princip[al] Consultant of JD Security Consultants, LLC[], located in Downingtown, PA.  Mr. Dowling has prepared an expert report summarizing his findings and conclusions relative to this case.  In summary fashion, Mr. Dowling found that both the original lighting specifications from 2004[,] and the upgrade of lighting specifications from 2016 for Store No. 7[,] did not meet the Illuminating Engineering Society of North America (hereinafter "IESNA["]) Guidelines for Security Lighting.  As a result, Mr. Dowling has opined that it is reasonable to conclude that the security lighting at the time of incident was also below the IESNA Guidelines.

According to [Appellant's] expert, potential threats in Sheetz convenience stores are produced by[,] and the opportunity created by[,] inadequacies in security programs such as lighting, visibility, security camera placement, security signage, staffing levels, staff and employee alertness and reporting.  Mr. Dowling identified the lack of reasonable security as being the main factor that created the opportunity for the subject crime to occur by limiting the observation of Mr. Hageder by the Sheetz employees in the store and the [Security Operations Center's ("SOC")] staffing monitoring the store via the video security system.  Mr. Dowling opined that the lighting level resulted in Mr. Hageder['s] being able to remain unnoticed by Sheetz['s] store staff and by SOC employees, thus allowing Mr. Hageder to remain unchallenged by Sheetz personnel prior to his assault upon [Appellant].

[Appellant] asserts that review of the Sheetz surveillance videos confirms Mr. Dowling's findings, i.e., that the parking lot where [Appellant's] assault occurred was so poorly lit that one has a difficult time, based upon review of the surveillance videos alone, … identify[ing] the activities of the persons depicted in the video. [Appellant] argues that there was also testimony elicited from witnesses during discovery that Sheetz Store No. 7 was more dimly lit than other Sheetz convenience stores in the area, including from [Appellant] himself, who was a truck driver for CLI Transport, a subsidiary of Sheetz.  [Appellant] had made deliveries to various Sheetz stores over 19 years.  In his deposition testimony, he stated that Store No. 7 was "dark and

dismissal[,"] compared to the illumination at other Sheetz stores. As an example, [Appellant] cited Sheetz's Beale Avenue and Patton stores as being better lit than Store No. 7. He described the Beale Avenue store as one where "you can play football at 3:00 in the morning in the parking lot[,"] and Store No. 7 as one "you can't see that far in front of your face, where this happened[." Appellant] further testified that when he made gas deliveries to Store No. 7, he needed to get cones out and put them on the manhole cover because there was not enough light to see the manhole.

In response, [Sheetz] asserts that the lighting at all Sheetz stores, including Store No. 7, exceed the recommendations for lighting standards set by IESNA, as well as other Codes. [Sheetz] also points out there are no written records of any complaints by any employee, nor any knowledge of any complaint regarding lighting by any Sheetz managers. Finally, [Sheetz] asserts that any "such [anecdotal] and undocumented hind-sight testimony" does not demonstrate either foreseeability or causation.

3. Lack of Crime Risk Analysis/Lack of Security. [Appellant's] expert, Mr. Dowling, opined that a security/crime risk assessment for Store No. 7 was required to determine the appropriate level of security needed for the store. Sheetz has admitted that it did not perform a security/crime risk assessment. [Appellant] asserts that the security/crime risk assessment is an accepted, common and standard practice in the security industry. Mr. Dowling explained that a security/crime risk assessment discovers the actual threats, inherent threats and potential threats facing the store[,] and that without such assessment, a security program cannot be adequately implemented and effectively maintained.

[Appellant] cites data obtained from the Altoona Police Department through discovery[,] which he believes supports his theory of liability ... against [Sheetz]. Specifically as to Store No. 7, the Altoona Police Department (hereinafter "APD") indicated that there was a total of 64 complaint reports filed for Store No. 7 between 3/2/11 and 3/2/16. Classifications of crimes by the APD were 64 total complaint reports; 35 violent or potentially violent reports (assault, suspicious activity, harassment, disturbance, intoxication and drug abuse) and 60 outside occurrences. The vast majority (over 90%) of the reported incidents were related to incidents occurring outside the store, thus, [Appellant] asserts that this area would be considered at high risk of violence, with a corresponding high level of security required.

[Appellant] also cites in his [b]rief that the numerous training materials and corporate policies of Sheetz support [Appellant's] arguments that 24-hour retail outlets have long been considered as one of the most dangerous business locations[,] and that the employees and customers of such establishments are at high risk for violence, including robbery.

In response, [Sheetz] points to the following deposition testimony from the individuals who were working at the Sheetz Store No. 7 on the night in question.

Melissa Snyder testified as follows:

a. She'd never witnessed another assault at Sheetz Store No. 7 prior to the subject assault.

b. That the area in which Store No. 7 is located is not a high crime area.

c. That she would have had no idea that Hageder was going to assault [Appellant] on the night in question.

Samantha Woomer, a former Sheetz Shift Supervisor and sales person who worked at Store No. 7 from 2005 through 2017, including the shift when the crime took place, testified as follows:

a. The assault by Hageder on [Appellant] was an "off the wall incident[."]

b. She had never experienced an incident like this in Store No. 7 in her 12 years there.

c. She had never even seen a fight at Sheetz Store No. 7.

Amy Stiffler had worked for Sheetz for about 10 years from 2008 until 2018, and was on duty at Store No. 7 on the night in question. Ms. Stiffler testified as follows:

a. She recalled only one violent criminal incident when a shooting outside of Store No. 7 occurred "way before" [Appellant's] assault.

b. In trying to recall when that incident occurred, she testified that it was even before the shooting at the Subway near the Logan Valley Mall, which occurred in 2009.

[Sheetz] notes that the Altoona Police records show that a violent, criminal assault at Store No. 7 occurred one time in the 5-years predating the Hageder assault.

[Sheetz] further asserts that of the 67 incidents from the 5-year period before the subject assault, commencing in 2011, there were only three incidents that could remotely or arguably resemble the subject incident. Those incidents include April 14, 2014, when one driver in a car followed another into the parking lot, got out a bat, and threatened to break out the back window of the other. No physical assault or violence was done. On March 29, 2015, two girls got into what was described as a "nuisance fight" and left the premises before the police came. The police report indicated that no one was in danger and that no alcohol or drugs were involved. Finally, there was an incident where a victim was stabbed[,] and the call to police came from the Altoona Hospital.

The Sheetz Store No. 7 incident reports show that, in addition to the fight between the two females on March 29, 2015 referenced above, there was also an incident where a female hit a male on July 27, 2012. No injuries or weapons were involved.

Further, there were emails between Sheetz employees exchanged the day of the subject incident that support [Sheetz's] theory that the criminal assault by Hageder upon [Appellant] was not foreseeable at Store No. 7. Those would include the following:

a. Chris Fasick remarked[,] "[W]hen I saw #7, I couldn't believe it.["]

b. Travis Sheetz observed that this is the "[l]ast place you would expect."

c. Stephanie Doliveira stated, "This is crazy…[.] And the fact that this is Store #7."

d. Holly Tekely emailed, "OMG - at #7 ???? I always thought that was a safe place."

[Sheetz] also cites the deposition of [Appellant] himself. [Appellant] testified that he had been to Store No. 7 "lots of times[,]" but he never told anyone at Sheetz that he thought it was dangerous[.] Nobody ever threatened him at Store No. 7. [Appellant] himself did not testify that he had been attacked there

previously and he knew of nobody else ever having been attacked there.

In response to [Appellant's] allegations relative to the video surveillance, Officer Heck testified that such video surveillance is not only of good quality, but actually described the surveillance and staff at Sheetz to be "remarkable.["] Officer Heck went so far as to say that the Sheetz video is much better quality than other retail stores in the area.

Jennifer McCullough, who has been a Security Operations Analyst at Sheetz for 12[-]and[-]½ years, testified that at every single Sheetz location, there are 16 to 32 surveillance cameras. Ms. McCullough's job, along with other [a]nalysts, is to provide safety and security for employees and customers[,] and they do this by monitoring videos at the [SOC,] which are capable of seeing and hearing any store in real time any time a store sends an alarm to the SOC. From that point, the SOC can communicate with the store with a voice-down where an incident is happening and also dispatch the proper authorities, whether police, fire or paramedical.

Further, the Sheetz Stores are equipped with multiple safety buttons and each employee wears a safety pendant so that any employee can notify the SOC at any time from any location. The SOC also tests every store every two weeks to make sure the buttons and pendants are working.

In response to [Appellant's] arguments about the lack of security guards at Store No. 7, Kathy Potter, who is the Manager of the Loss Investigation Team and the SOC, was called twice to testify during discovery. Ms. Potter testified that there were no security guards at Store No. 7 on the date of the Hageder assault because there was simply no reason to have them, given the history of the store. She explained that where circumstances and history warranted, Sheetz would employ security guards. She gave as an example Store No. 354 (known locally as the "Super Sheetz" located on 17th Street and Pleasant Valley Boulevard). Ms. Potter explained that in contrast to Store No. 7, the store at 354 is a large new store, with new concepts such as a restaurant and sale of alcohol. It has served as a draw for young people to loiter and race around the parking lot. [Appellant] has not shown that similar conditions existed at Store No. 7.

During her second deposition, Ms. Potter explained that the reason that there were not security guards at other stores, such as Store

No. 7, is that "there haven't been issues...[.] And if there is an issue, it is a transient issue. And it could not be anticipated."

In consideration that Sheetz Store No. 7 is open 24 hours a day, 365 days per year, [Sheetz] argues that the evidence of record does not support [Appellant's] claims that Store No. 7 is in an area that would be considered "at high risk of violence." Further, [Sheetz] states that [Appellant] has not established of record that there was a lack of security, or a need for additional security, at Store No. 7, nor that [Sheetz's] operations were unsafe or unreasonable.

4. Alleged Failure to Follow Sheetz's Robbery Prevention Plan. At the time of [Appellant's] assault, Sheetz had implemented a "Robbery Prevention Plan[,"] which was intended to provide information to Sheetz employees to be used to maintain a safe store environment. In his Brief, [Appellant] cited, in extensive detail, references to [Sheetz's] Robbery Prevention Plan and its stated goals, including to "maintain a safe store environment"; "maintaining good lighting and visibility"; the concerns for "customer awareness"; that "employee awareness can discourage a potential criminal"; and that "if there are any concerns about suspicious behavior or loitering, alert a management person." [Appellant] cited additional similar language contained in the [Sheetz] Robbery Prevention Plan as well as its training videos in his Brief.

In his expert report, Mr. Dowling emphasized that Sheetz acknowledged a duty owed to its customers by reference to that part of the training video, wherein the narrator states:

"...violence and robbery prevention ... it's your responsibility to keep yourself and your customers safe...[.]"

[Appellant] points out that as a supplement to its training videos, Sheetz also has newly[-]hired employees review a "Safety 5-in-5" computer presentation, which reiterates the same concepts and safety measures as set forth in the training video.

Notwithstanding the Robbery Prevention Plan and the training that is offered to [Sheetz's] employees, [Sheetz] asserts that there is absolutely no evidence of record to support that any Sheetz employee at Store No. 7 on the date in question had any reason to suspect that the criminal acts of Hageder were going to occur.

Trial Court Opinion ("TCO"), 4/2/20, at 5-7, 8-23 (some original brackets and internal citations omitted; emphasis in original).

In granting summary judgment in favor of Sheetz, the trial court found "as a matter of law that Hageder's actions were not reasonably foreseeable and were the sole proximate cause of [Appellant's] injuries." Id. at 36. More specifically, it opined:

> In close examination of [Appellant's] claims, [Appellant] alleges that additional lighting would have prevented the criminal assault by Hageder upon [Appellant]. [Appellant] alleges that if the three store employees on the night in question were observing the security videos and/or looking out the window, that they could have prevented the criminal assault by Hageder upon [Appellant]. [Appellant] alleges that additional staffing and/or brighter illumination would have prevented the criminal assault by Hageder upon [Appellant]. [Appellant] further alleges that inadequate and/or inconsistent training or practice of employees regarding safety concerns contributed or caused [Appellant's] injuries. Each of [Appellant's] claims is speculative and conjectural.
>
> It is easy to determine now, after the fact, that the parking of the vehicle in the Sheetz parking lot and opening [of] the hood by Hageder, as if there were mechanical problems, was simply a ruse as he awaited an individual upon whom he would inflict the intentional assault. We do not agree with [Appellant] that the mere fact that someone would have pulled into the Sheetz parking lot at 3:00 o'clock in the morning to check under the hood for potential car trouble somehow should have alerted the Sheetz employees that a criminal assault was about to take place. There is nothing that [Appellant] has pointed to in the record that credibly supports that Hageder and his companion were acting in a threatening or suspicious manner prior to the assault. We believe the time element is significant to our determination. The assault began within 5 minutes after Hageder arrived at the Sheetz parking lot. The entire assault lasted approximately 33 seconds. Hageder was on the Sheetz premises for a total of just over 5 minutes. Such hardly constitutes "loitering" that should have alerted the Sheetz employees that a criminal assault was about to take place.

\* \* \*

> In summary, there is nothing to point to in the record which would establish proximate cause between any action or inaction of Sheetz[,] and the injuries sustained by [Appellant]. What happened to [Appellant] is horrible and most unfortunate. Hageder is 100% responsible, however, for [Appellant's] injuries as a result of his intentional criminal assault....

Id. at 27-28, 34.

Presently, Appellant raises several issues for our review:

> [1.] Whether the lower court abused its discretion and commit[ted] errors of law in holding that no material questions of fact existed as to Sheetz'[s] negligence?
>
> [2.] Whether the lower court abused its discretion and commit[ted] an error of law in holding that the risk of criminal conduct by a third person on Sheetz'[s] premises was not reasonably foreseeable — i.e., the robbery/assault of [Appellant] was a superseding/intervening cause of [his] harm?
>
> [3.] Even assuming that the lower court was correct in holding that the robbery/assault of [Appellant] was not reasonably foreseeable (i.e., a superseding/intervening event), did the lower court err in holding that a material question of fact did not exist with respect to Sheetz'[s] negligence in failing to detect/deter the robbery/assault once the robbery/assault began?
>
> [4.] Did the lower court abuse its discretion and commit an error of law in considering the breadth of the crime spree of [Appellant's] assailant prior to the robbery/assault of [Appellant]?
>
> [5.] Did the lower court improperly rely upon hearsay evidence in granting Sheetz'[s] Motion for Summary Judgment?
>
> [6.] Did the lower court abuse its discretion and commit an error of law in failing to consider the opinions of [Appellant's] expert witness, Jack Dowling?

Appellant's Brief at 4-5.

At the outset, we acknowledge:

Entry of summary judgment is governed by Rule 1035.2 of the Rules of Civil Procedure:

- 14 -

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.  In addition:

Our standard of review of an appeal from an order granting summary judgment is well settled: Summary judgment may be granted only in the clearest of cases where the record shows that there are no genuine issues of material fact and also demonstrates that the moving party is entitled to judgment as a matter of law.  Whether there is a genuine issue of material fact is a question of law, and therefore our standard of review is de novo and our scope of review is plenary.  When reviewing a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party.

Reason v. Kathryn's Korner Thrift Shop, 169 A.3d 96, 100 (Pa. Super. 2017) (internal citation omitted).

### Issues 1 and 2

We address Appellant's first and second issues together as they both contest the trial court's causation determinations.  See Appellant's Brief at 33 (arguing that the trial court "abused its discretion and committed errors of law in holding that no material questions of fact existed as to whether Sheetz'[s] negligence was the proximate cause of [Appellant's] harm") (unnecessary

capitalization and emphasis omitted); id. at 42 (stating that the trial court "abused its discretion and committed an error of law in holding that the risk of criminal conduct by a third person on Sheetz'[s] premises was not reasonably foreseeable — i.e., the robbery/assault of [Appellant] was a superseding/intervening cause of [Appellant's] harm") (unnecessary capitalization and emphasis omitted).

It is well-established in our Commonwealth that,

[i]n order to hold a defendant liable for negligence, the plaintiff must prove the following four elements: (1) a legally recognized duty that the defendant conform to a standard of care; (2) the defendant breached that duty; (3) causation between the conduct and the resulting injury; and (4) actual damage to the plaintiff.

Reason, 169 A.3d at 101 (citation omitted).

This Court has explained:

"Generally, there is no duty to control the acts of a third party unless the [d]efendant stands in some special relationship with either the person whose conduct needs to be controlled or ... with the intended victim of the conduct, which gives the intended victim a right to protection." Paliometros v. Loyola, 932 A.2d 128, 133 (Pa. Super. 2007) (citation and internal quotation marks omitted). A "special relationship" exists between a business and its invitee. Id. (citing T.A. v. Allen, ... 669 A.2d 360 ([Pa. Super.] 1995) (en banc), appeal denied, ... 676 A.2d 1201 ([Pa.] 1996); Restatement (Second) of Torts § 314A(2)–(3) (1965)). In T.A., we explained:

[A]n invitee is described as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land.

Restatement (Second) of Torts § 332. Ott v. Unclaimed Freight Co., … 577 A.2d 894, 896 ([Pa. Super.] 1990).

\* \* \*

This Court examined the duty to protect business invitees from the intentional or negligent acts of third parties in Truax v. Roulhac, 126 A.3d 991, 997-98 (Pa. Super.[ 2015]), appeal denied, … 129 A.3d 1244 ([Pa.] 2015). The Court in that case observed that this duty is expressed in Section 344 of the Restatement (Second) of Torts, which states:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

The [c]ourt in Truax explained:

Comment f to Section 344 explains the duty to protect business invitees against third[-]party conduct arises only if the owner has reason to anticipate such conduct.

f. Duty to police premises. Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If

the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Restatement (Second) of Torts § 344 cmt. f.

Consequently, [the a]ppellees owed Truax "a duty owed to any business invitee, namely, that [they] would take reasonable precaution against harmful third[-]party conduct that might be reasonably anticipated." Paliometros..., 932 A.2d [at] 133 ... (citations omitted).

The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation.

Feld v. Merriam, ... 485 A.2d 742, 745 ([Pa.] 1984).

Truax, 126 A.3d at 997-98.

Reason, 169 A.3d at 102-03 (emphasis in original).

Here, assuming Appellant established the other elements of negligence, i.e., that Sheetz had a duty to take reasonable precaution against harmful third-party conduct that might be reasonably anticipated, breach of that duty, and harm, we agree with the trial court in the case sub judice that Appellant has not demonstrated that any deficiencies in the security precautions Sheetz took proximately caused his harm. We have stated that "[p]roximate cause does not exist where a defendant's negligence was so remote that the

defendant cannot be held legally responsible as a matter of law for the harm that resulted to the plaintiff." Kote v. Bank of New York Mellon, 169 A.3d 1103, 111 (Pa. Super. 2017) (citation omitted). "To determine proximate cause, … the question is whether the defendant's conduct was a 'substantial factor' in producing the injury." Brown v. Philadelphia College of Osteopathic Medicine, 760 A.2d 863, 869 (Pa. Super. 2000) (citation and some internal quotation marks omitted). Further, "[p]roximate cause is primarily a problem of law and it is a Pennsylvania court's responsibility to evaluate the alleged facts and refuse to find an actor's conduct the legal cause of harm when it appears to the court highly extraordinary that the actor's conduct should have brought about the harm." Id. at 868 (citation, internal quotation marks, and emphasis omitted). "Thus, proximate cause must be determined by the judge and it must be established before the question of actual cause is put to the jury." Id. (citation and internal quotation marks omitted).

Appellant claims that "material questions of fact have been established with respect to a myriad of causation theories in this case." Appellant's Brief at 36. He points to his assertions that:

> 1) Sheetz failed to provide adequate management, supervision, and oversight or reasonable security and/or protection; 2) Sheetz failed to ameliorate the risks inherent from dangerous individuals which it knew or in the exercise of reasonable care should have known were present on the premises; 3) a dangerous condition was permitted by Sheetz to persist, remain uncorrected and/or continue thereby allowing [Appellant] to be attacked; 4) Sheetz breached its duty to provide reasonable security and protection to its customers, and to ameliorate the risks inherent from the

dangerous individuals which it knew, or in the exercise of reasonable care should have known, were present on its premises; 5) the attack on [Appellant] by a dangerous criminal was allowed to proceed unabated and unthwarted by the staff/employees of Sheetz; 6) Sheetz failed to properly assess the condition of [Appellant's] assailant prior to allowing him to enter/remain upon the premises; Sheetz failed to adequately supervise its employees; 7) Sheetz provided inadequate lighting conditions in the parking lot of its store; 8) Sheetz failed to prevent [Appellant's] assailant from loitering in Sheetz'[s] parking lot; 9) Sheetz had ineffective video surveillance camera placement; 10) Sheetz failed to have general security risk assessments performed; and Sheetz failed to adequately staff and train the personnel in its [SOC].

Id. at 36-37.

Despite listing all of these purported failings by Sheetz, Appellant has not established how these things acted as substantial factors in bringing about his harm.[4] Hageder was on Sheetz's premises for 5-6 minutes total, and his

_____

[4] Appellant also does not specifically discuss in his brief legal authority pertaining to proximate cause. Rather, he focuses on Section 344 of the Restatement (Second) of Torts, and cases analyzing it. Section 344 addresses a business's duty to protect business invitees from the intentional or negligent acts of third parties. See Pearson v. Philadelphia Eagles, LLC, 220 A.3d 1154, 1162, 1165 (Pa. Super. 2019) (explaining that, under Section 344, "the duty to protect business invitees against third[-]party conduct arises only if the owner has reason to anticipate such conduct[,]" and there was no evidence that the appellants "knew or had reason to know, from past experience, that violent assaults were likely to occur in the restrooms that would endanger [the a]ppellant[s'] invitees. Therefore, … [the a]ppellants did not act unreasonably by not stationing security personnel in or directly outside the stadium restrooms") (citations omitted); Reason, 169 A.3d at 104 ("[The a]ppellees had no reason to anticipate violent acts by [the perpetrator] against their business invitees, and therefore had no duty to protect [the plaintiff] as a business invitee."). Appellant overlooks that he still must establish that Sheetz's alleged breach of its duty under Section 344 proximately caused his harm. See, e.g., Rabutino v. Freedom State Realty Co., Inc., 809 A.2d 933, 942 (Pa. Super. 2002) (denying summary judgment in favor of a hotel

assault on Appellant lasted only 33 seconds. Though Appellant avers that Hageder's vehicle was illegally parked in a reserved handicapped spot with its hood open, and Polhamus's face showed signs she had been beaten, there is no evidence that Hageder or Polhamus engaged in any threatening behavior outside the store that should have somehow alerted the store employees that a criminal assault was about to occur. As the trial court aptly observed, "[w]e do not have a situation where someone entered the store and/or was walking around the outside of the store openly brandishing a weapon or acting in a threatening or suspicious manner. We do not have a situation where someone was lingering in or about the store for an unusual length of time." TCO at 31. Further, Hageder's actions on the day in question suggest that he had little, if any, concern for the store's security features or the consequences of his conduct. See id. at 32 (recognizing that Hageder "had his mind set on engaging in significant and extreme criminal activity").

Under these factual circumstances, Appellant has not demonstrated that Sheetz's purportedly deficient lights, staffing, security cameras, employee training program, management, or monitoring practices, etc., proximately caused his injuries. The record does not show how any of these allegedly

―――――――――――――――――――――――――――――

where the appellant showed that the hotel may have breached a duty owed to the decedent under Section 344 by not ejecting out-of-hand drinkers, and that the confrontation that killed the decedent "may reasonably be understood to have sprung directly and predictably from the failure to respond adequately to events as they evolved on the [hotel's] fifth floor. We therefore find that [the appellant] has sufficiently established the element of causation with evidence that [the hotel's] purported negligence was a substantial factor in bringing about [the decedent's] death").

deficient safety precautions proximately caused the assault to happen, or how any different security features would have prevented the assault from occurring given the facts of this case. Accordingly, we agree with the trial court that Hageder's actions were the sole proximate cause of Appellant's injuries. Appellant has not convinced us otherwise.

## Issue 3

In Appellant's third issue, he argues that a material question also exists "as to whether Sheetz failed to timely detect that [Appellant] was in the act of being violently robbed, and whether Sheetz took reasonable steps to deter [Appellant's] assault once it began." Appellant's Brief at 54. He says that the "lower court ruled as a matter of law that … 33 seconds was not an unreasonable length of time for either Sheetz'[s] employees or its [SOC] to not detect that one of its customers was being severely beaten[,]" and "questions whether the lower court may arbitrarily draw the line as a matter of law with respect to Sheetz'[s] obligation to detect that one of its customers was in the process of being severely beaten in the parking lot with a metal socket wrench and having his truck forcibly stolen, without taking steps to intervene." Id. at 55 (emphasis in original). Appellant "asserts that the actions which could have been taken by Sheetz employees[,] had they been able to detect that a robbery/assault were occurring[,] are questions of fact which preclude the entry of summary judgment." Id.

No relief is due on this basis. Initially, Appellant's argument on this issue is a page-and-a-half long, and includes no citation to, or discussion of,

relevant authority pertaining to an employee's duty to aid in an ongoing assault. Thus, we deem it waived. In re M.Z.T.M.W., 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.") (citations omitted).

Nevertheless, even if we did not deem this issue waived, we would reject Appellant's claim. First, regarding Sheetz's alleged failure to timely detect that Appellant was being assaulted, Appellant again has not established that that failure proximately caused his harm. The assault lasted merely 33 seconds, making it highly unlikely that Sheetz's failure to timely detect that the assault was happening brought about Appellant's injuries. See Brown, supra. Second, even if Sheetz had timely detected that the assault was occurring, this Court has stated that "a business [is] not required to act as a policeman in the face of an ongoing assault. Indeed, imposing such a duty could place the business employees at risk of harm and impose liability on the business if its employees are injured." Reason, 169 A.3d at 105. Consequently, it appears that Sheetz's employees would not have had a duty to intervene in the assault once it began even if they had timely detected it.[5]

_____

[5] Instead, this Court has determined that "a business satisfies its duty to aid a business invitee by calling 911 or another source of professional medical or police assistance." Reason, 169 A.3d at 105-06 (footnote omitted). Here, Sheetz explains in its brief that,

> [a]t the time of the subject accident, three analysts were on duty[,] including Adam Stoehr. The SOC at the time was directly

Therefore, had Appellant not waived this issue, we would still conclude that the trial court did not err in this respect.

## Issue 4

In Appellant's fourth issue, he advances that the trial court "abused its discretion and committed an error of law in considering the breadth of the crime spree of [Appellant's] assailant prior to the robbery/assault of [Appellant]." Appellant's Brief at 55 (unnecessary capitalization and emphasis omitted). He claims that "the breadth of ... Hageder's crime spree before he arrived at the parking lot of Sheetz Store No. 7 is wholly irrelevant to the central issue germane to the disposition of Sheetz's Motion for Summary Judgment — i.e., whether Sheetz is responsible for injuries to its patrons caused by criminal conduct of a third party if the possibility or likelihood of criminal activity ... could reasonably have been foreseen or anticipated." Id. at 56-57 (citations omitted).

---

connected to Store No. 7[,] and Stoehr was on break and actually in Store No. 7[,] when Appellant came back into the store after the Hageder assault. Stoehr rushed back to the SOC and notified Ms. McCullough[, a Security Operations Analyst at Sheetz,] that there was an incident and Ms. McCullough had already been told that emergency personnel had been called and confirmed that they were on site at 3:27 a.m., less than 8 minutes after the assault.

Sheetz's Brief at 10-11 (internal citations omitted). Appellant does not contest these assertions in his brief. Thus, we do not consider whether Sheetz breached its duty to aid Appellant by failing to call 911 or another source of professional assistance.

We deem this argument waived. In support of his claim, Appellant provides no authority or discussion about what constitutes relevant evidence. We reiterate that "[i]t is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." See In re M.Z.T.M.W., 163 A.3d at 465 (citations omitted).

Nonetheless, even if not waived, we would determine that Appellant's argument is meritless. Appellant's argument only addresses whether evidence of the breadth of Hageder's crime spree was relevant to proving that Sheetz owed a duty to Appellant. Appellant does not consider if that evidence was relevant to establishing any other material fact in the case, such as causation. It is well-established that "[e]vidence is relevant if it tends to establish some fact material to the case, or if it tends to make a fact at issue more or less probable." See Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 905 (Pa. 2007) (citations omitted). Evidence that Hageder had been on a violent crime spree before the assault on Appellant supports that any breach by Sheetz of its duty to take reasonable precaution against harmful third-party conduct (for instance, by supposedly having inappropriate security signage) did not proximately cause Appellant's harm. See Appellant's Brief at 23, 35 (noting that security signage was lacking from Store No. 7). Hageder's crime spree shows that "Hageder had his mind set on engaging in significant and extreme criminal activity[,]" and tends to establish that things like Sheetz's purportedly inadequate security signs did not play a substantial

part in generating Appellant's harm, as Appellant was unlikely to be deterred by such things. TCO at 32. Thus, had Appellant not waived this issue, we would determine that the trial court did not abuse its discretion or err in considering Hageder's activities prior to his arriving at Sheetz Store No. 7 due to their irrelevance.

### Issue 5

In Appellant's fifth issue, he contends that the trial court "improperly relied upon hearsay evidence in granting Sheetz'[s] motion for summary judgment." Appellant's Brief at 58. He says that "Hageder's alleged out[-]of[-]court statements contained in a transcription of a recorded statement given by Hageder to the Altoona Police Department were hearsay." Id. Further, he posits that "Hageder's alleged out[-]of[-]court statements made to Ms. Polhamus, who repeated the alleged statements in a recorded statement given by Polhamus to the Altoona Police Department, were hearsay within hearsay." Id. He argues that "[a] motion for summary judgment cannot be supported by statements that include inadmissible hearsay evidence." Id. (citing Botkin v. Metropolitan Life Ins. Co., 907 A.2d 641, 649 (Pa. Super. 2006)).

Again, we deem this claim waived. In paragraph 10 of Sheetz's motion for summary judgment, Sheetz set forth as undisputed facts certain statements Hageder had made in his interview with police, see page 4, supra. In responding to that paragraph, Appellant did not specifically claim that those

- 26 -

statements constituted inadmissible hearsay and, therefore, could not be considered by the trial court. Rather, he stated:

> 10. [Appellant] admits that [Sheetz] has accurately described statements attributed to Mr. Hageder as transcribed by the Altoona Police Department. [Appellant] is unable to admit or deny … that Mr. Hageder's statements were accurately transcribed. [Appellant] denies that any of the statements referenced in Paragraph 10 and its sub-paragraph are material to a disposition of [Sheetz's] Motion for Summary Judgment.

Appellant's Response to Sheetz's Motion for Summary Judgment at 3 (unnumbered). Appellant likewise did not mention that Mr. Hageder's statements constituted inadmissible hearsay in his brief in opposition to Sheetz's motion for summary judgment. Instead, he waited to raise this hearsay objection for the first time in his sur-reply brief in opposition to Sheetz's Motion for Summary Judgment. See Harber Philadelphia Center City Office Ltd. v. LPCI Ltd. Partnership, 764 A.2d 1100, 1105 (Pa. Super. 2000) ("Because, under [Pa.R.C.P.] 1035.3, the non-moving party must respond to a motion for summary judgment, he or she bears the same responsibility as in any proceeding, to raise all defenses or grounds for relief at the first opportunity.").

In any event, even if not waived, any error or abuse of discretion in this respect would not affect our analysis or disposition. In our view, Hageder's post-assault statements constitute cumulative evidence, given that the evidence of Hageder's pre-assault activities similarly demonstrate his devil-may-care state of mind on the day in question and suggest that he likely would not have been deterred by certain safety features, such as security signage.

Further, regardless of Hageder's post-assault statements, it remains that Appellant has not established that Sheetz's purportedly deficient lights, staffing, security cameras, employee training program, management, or monitoring practices, etc., were substantial factors in producing Appellant's injuries. Accordingly, the exclusion of Hageder's post-assault statements would not change our evaluation.

### Sixth Issue

In Appellant's sixth and final issue, he argues that the trial court "abused its discretion and committed an error of law in failing to consider the opinions of [Appellant's] expert witness, Jack Dowling." Appellant's Brief at 60 (unnecessary capitalization and emphasis omitted). He asserts that the trial court's "reasoning that the Dowling report is irrelevant wholly ignored technical issues addressed by Mr. Dowling, which spoke to Sheetz'[s] breach of its duty owed to business invitees caused by 1) inadequate lighting at Sheetz Store No. 7...; 2) inadequate security/safety procedures at Sheetz Store No. 7; and 3) crime risk analyses." Id. at 61. Appellant maintains that "[t]hese technical issues were not within the ordinary realm of knowledge of laypersons and are therefore fair game for expert testimony." Id.

No relief is due on this basis. Here, the trial court stated that Mr. Dowling's expert report "has no effect on [its] legal determination herein of proximate cause." TCO at 29 (citation omitted). This Court has previously discerned that an expert's report can have no effect on a decision that was based on legal or proximate cause rather than causation in fact. Novak v.

Jeannette Dist. Memorial Hosp., 600 A.2d 616, 619 (Pa. Super. 1991). Thus, we ascertain no error or abuse of discretion by the trial court in not considering Dowling's opinions in its proximate cause analysis. In conclusion, because none of Appellant's issues have merit, we affirm the trial court's order granting summary judgment in favor of Sheetz.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2020